**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**



SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

FEB 08 2016

ARTHUR JOHNSTON
BY _____ DEPUTY

**UNITED STATES OF AMERICA,**
**ex. rel. MITCHELL D. MONSOUR and**
**WALTON STEPHEN VAUGHAN**                        **PLAINTIFFS**

**V.**                        Civil Action No. 1:16cv38 HSO-JCG

**NORTH SUNFLOWER MEDICAL CENTER,**
**NORTH SUNFLOWER MEDICAL FOUNDATION,**
**FRANKLIN COUNTY MEMORIAL HOSPITAL,**
**FRANKLIN COUNTY MEMORIAL HOSPITAL MEDICAL FOUNDATION,**
**TALLAHATCHIE GENERAL HOSPITAL AND EXTENDED CARE FACILITY,**
**TALLAHATCHIE GENERAL HOSPITAL MEDICAL FOUNDATION,**
**PERFORMANCE ACCOUNTS RECEIVABLE, LLC,**
**PERFORMANCE CAPITAL LEASING, LLC,**
**STEPPING STONES HEALTHCARE, LLC,**
**WELLNESS ENVIRONMENTS, INC.,**
**WADE WALTERS,**
**CLAYTON V. DEARDORFF,**
**MIKE BOLEWARE,**
**HOPE THOMLEY,**
**DENNIS L. PIERCE, and**
**PIERCON, INC.**                        **DEFENDANTS**

## COMPLAINT - FILED UNDER SEAL

This is a Complaint brought on behalf of the United States of America, by Mitchell

D. Monsour and Walton Stephen ("Steve") Vaughan as Relators/Plaintiffs, for treble

monetary damages, civil penalties, and related further relief, pursuant to the *qui tam*

provisions of the False Claims Act, 31 U.S.C. §§ 3729 - 3720 ("FCA"), against each of

1

the entities and persons named as Defendants above.

## The Parties

1.     Plaintiff/Relator Mitchell D. Monsour, an adult resident of Hinds County, Mississippi and a citizen of the United States, earned a Masters in Health Administration from the George Washington University in Washington, D.C., and is a Fellow of the American College of Healthcare Executives.  He has served for approximately thirty-nine (39) years as a health care executive and management consultant, including service during more than twenty years as a hospital consultant engaged by numerous large and small hospitals.

2.     Plaintiff/Relator Walton Stephen ("Steve") Vaughan, an adult resident of Pearl River County, Mississippi, and a citizen of the United States, is now (and has been throughout the periods involved in the conduct described below), a manager and executive of hospital and other health care entities in numerous states. Vaughan currently serves as Chief Executive Officer ("CEO") and Administrator of the Pearl River County Hospital and Nursing Home ("Pearl River County Hospital") located in Poplarville, Mississippi.

3.     Beginning in 2012, Plaintiff/Relator Monsour as a consultant engaged by Pearl River County Hospital, and Plaintiff/Relator Vaughan as the CEO and Administrator of the same Hospital, uncovered together the activities by the Defendants described below, engaged auditors, attorneys, architects and other professionals, to further

uncover more details of those activities, and disclosed the substance of those activities to federal health care fraud investigators and officials, including the Office of the Inspector General ("OIG") of the U. S. Department of Health and Human Services ("HHS"), and contractors engaged by the Center for Medicare and Medicaid Services ("CMS") to receive and investigate evidence of fraud against the Medicare system. After acquiring through their investigation the information reflected herein, the Relators then caused a private lawsuit to be filed on behalf of the Pearl River County Hospital against some of the Defendants herein.

4.      The origin and initial subject matter of the Relators' investigation of the conduct by Defendants Watlers and Deardorff (and companies controlled and influenced by them) was in Pearl River County, Mississippi, in which such Defendants had conducted activities of the kind described below, such that venue is lawful within the Southern Division of this District.

5.      Defendant North Sunflower Medical Center is a County-owned hospital, located at 840 North Oak Avenue, Ruleville, Mississippi, the board of directors of which is appointed by the County Board of Supervisors of Sunflower County, Mississippi. Defendant North Sunflower Medical Foundation is a corporate entity affiliated with and funded by the North Sunflower Medical Center. Both such entities may be served with process through service at the address of 840 North Oak Avenue, Ruleville, Mississippi, on North Sunflower CEO and Administrator Sam Miller. Every

reference hereafter to "North Sunflower Hospital" shall be regarded as a reference to both Defendant North Sunflower Medical Center and North Sunflower Medical Foundation.

6.      Defendant Franklin County Memorial Hospital is a County-owned hospital, located at 40 Union Church Road, Meadville, Mississippi, the board of directors of which is appointed by the County Board of Supervisors of Franklin County, Mississippi. Defendant Franklin County Memorial Hospital Medical Foundation is a corporate entity affiliated with and funded by the Franklin County Memorial Hospital. Both such entities may be served with process through service at the address of 40 Union Church Road, Meadville, Mississippi, on Franklin County Memorial  Hospital CEO and Administrator Mike Boleware. Every reference hereafter to "Franklin County Hospital" shall be regarded as a reference to both Defendant Franklin County Memorial Hospital and to Franklin County Memorial Hospital Medical Foundation.

7.      Defendant Tallahatchie General Hospital and Extended Care Facility is a County-owned hospital, located at 201 South Market Street, in Charleston, Mississippi, the board of directors of which is appointed by the County Board of Supervisors of Tallahatchie County, Mississippi. Defendant Tallahatchie General Hospital Medical Foundation is a corporate entity affiliated with and funded by the Tallahatchie General Hospital and Extended Care Facility. Both such entities may be served with process through service at the address of 201 South Market Street, in Charleston, Mississippi, on CEO and Administrator Jim Blackwood. Every reference hereafter to "Tallahatchie

4

General Hospital" shall be regarded as a reference to both Defendant Tallahatchie General Hospital and Extended Care Facility and Tallahatchie General Hospital Foundation.

8. Defendant Performance Accounts Receivable, LLC (hereafter referred to as "PAR"), is a Mississippi limited liability company, owned and controlled by Defendant Wade Walters, located at 104 Bocage Court, Hattiesburg, Mississippi, and may be served by service on Wade Walters at that address.

9. Defendant Performance Capital Leasing, LLC (hereafter referred to as "PCL"), is a Mississippi limited liability company, also owned and controlled by Defendant Wade Walters, located at 104 Bocage Court, Hattiesburg, Mississippi, and may be served by service on Wade Walters at that address.

10. Defendant Stepping Stones Healthcare, LLC, is a limited liability company, owned and controlled by Defendant Clayton V. Deardorff, which maintains a principal place of business at 2075 Winchester Drive, Frisco, Texas, and may be served by service on Clayton V. Deardorff at that address.

11. Defendant Wellness Environments, Inc., is a corporation which constructs or renovates buildings and related facilities for hospitals throughout the United States, and maintains its principal place of business at 1 Vantage Way, D-100, Nashville, Tennessee, where it may be served with process.

12. Defendant Wade Walters, is an adult resident of Hattiesburg, Mississippi,

5

who owns and controls numerous purported management companies which enter

contracts with hospitals and other health care entities, and may be served at 104 Bocage

Court, Hattiesburg, Mississippi.

13.     Defendant Clayton V. Deardorff, is an adult resident of the State of Texas,

who owns, controls and participates in numerous purported management and leasing

companies which enter contracts with hospitals and other health care entities, purportedly

to manage hospital-based outpatient mental health therapy facilities and other such

hospital services.  Deardorff may be served at 2075 Winchester Drive, Frisco, Texas.

14.     Defendant Mike Boleware, an adult resident of Meadville, Franklin County,

Mississippi, may be served with process at his office location at the Franklin County

Hospital as set forth above.

15.     Defendant Hope Thomley, an adult resident of Hattiesburg, Forrest County,

Mississippi, may be served with process at her business office at 6068 U. S. Highway 98,

Suite I-226, Hattiesburg, Mississippi, or at 23 Deer Valley Drive, Hattiesburg,

Mississippi.

16.     Dennis L. Pierce, is an adult resident of Hattiesburg, Forrest County, and

may be served with process at the business location of 23 Liberty Place, Hattiesburg,

Forrest County, Mississippi.

17.     Defendant Piercon, Inc., is a Mississippi for-profit construction

company, owned and controlled by Defendant Dennis L. Pierce, and may likewise be

served with process at the business location of 23 Liberty Place, Hattiesburg, Forrest County, Mississippi.

## The False Claims Act

18.    The False Claims Act (FCA) provides in pertinent part, through 31 U.S.C. § 3729(a)(1), that:

> (a) Any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;  (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; ... or (G) knowingly makes, uses, or causes to be made or used , a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....

19.    For the purpose of that provision, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.  31 U.S.C. § 3729(b)(1)(A).

## Medicare, Hospitals' Entitlement to Medicare Payments, and the Anti-Kickback Act

20.    The United States, through HHS and CMS as its component agency,

7

administers the Medicare Part A and Medicare Part B programs.  Generally, hospitals are reimbursed for inpatient services through the Medicare Part A program, and for outpatient services through the Medicare Part B program.

21.     Hospitals and other health care providers who participate in the Medicare program are required to enter into contracts or "Medicare Enrollment Applications" with CMS, in a contract form known as a "CMS-855A" form.  Each of the Hospital Defendants in this case entered such contracts. (The term "Hospital Defendants" when used herein, and when used hereafter in the course of this Complaint, shall mean each of the following Defendants and their authorized administrators and agents: North Sunflower Medical Center, North Sunflower Medical Foundation, Franklin County Memorial Hospital, Franklin County Memorial Hospital Medical Foundation, Tallahatchie County Memorial Hospital Medical Foundation, Tallahatchie General Hospital and Extended Care Facility, Perry County General Hospital, LLC, Quitman County Hospital, LLC, Hardy Wilson Memorial Hospital, and the Noxubee General Hospital.)

22.     Each of the Hospital Defendants therefore executed an Enrollment Application and Agreement with CMS in which each such hospital represented that through its authorized responsible official it "understand(s) that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions . . . and on the provider's compliance with all applicable conditions of participation in Medicare."

8

23.     As a further part of enrolling and re-enrolling in the Medicare system, for instance, each of the Hospital Defendants expressly certified, above a signature by its authorized management and on a CMS Form 855-A, that the Hospital's administration then had an actual understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions," expressly "including" the "Federal anti-kickback statute" among other federal health care laws. Each such Hospital Defendant therefore had actual knowledge, prior to any claim of the kind alleged to be legally false in this case, that its entitlement to be paid under any such program any amount for any claim was conditioned on that claim not being the result of and not arising from any activity undertaken in exchange for any inducement paid or offered in violation of the Anti-Kickback Act ("AKA"), codified at 42 U.S.C. § 1320a-7b(b), which provides as follows:

(B) Illegal remunerations

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind–
(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
shall be guilty of a felony and upon conviction thereof, shall be fined no more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any

> remuneration (including any kickback, bribe, or rebate)
> directly or indirectly, overtly or covertly, in cash or in kind, to
> any person to induce such person –
> (A) to refer an individual to a person for the furnishing or
> arranging for the furnishing of any item or service for which
> payment may be made in whole or in part under a Federal
> health care program, or
> (B) to purchase, lease, order, or arrange for or recommend
> purchasing, leasing or ordering any good, facility, service, or
> item for which payment may be made in whole or in part under
> a Federal Health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined no more than $25,000 or imprisoned for not more than five years, or both.

24.      The federal AKA arose out of congressional concern that financial inducements to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, and even harmful to a vulnerable patient population.  To protect the integrity of the Medicare program from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to widen the scope of what constitutes an illegal remuneration under the AKS. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242 subparts b and c; 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Antiabuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

25.      One of the purposes of the AKA is to ensure that health care providers compete for business based on the quality and efficiency of care provided to patients.

When important health care decisions are influenced by improper inducements,
competition among health care providers is diminished.  Consequently, patient care
suffers, as an incentive is created for health care providers to distinguish themselves based
on the financial inducements they offer rather than on the quality and efficiency of
services they provide.

26.     This broad scope and the substantial penalties reflect the significance of the
prohibition against kickbacks as a critical tool in the fight against health care fraud.  *See*
H. Rep. 95-393, 95th Cong., 1st Sess. at 44, *reprinted in* 1977 U.S.C.A.N. 3039, 3047.
Indeed, as part of the comprehensive health care reform legislation enacted in 2010,
Congress amended the AKA to emphasize that "a claim that includes items or services
resulting from a violation of this section, constitutes a false or fraudulent claim for
purposes of [the False Claims Act]."  Patient Protection and Affordable Care Act of 2010
(PPACA), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119 (codified at 42 U.S.C. § 1320a-
7b(g)).

### Critical Access Hospitals' Entitlements to Medicare Payments

27.     The Medicare program designates approximately 1,200 to 1,400 small
hospitals in the United States as "Critical Access Hospitals" (sometimes referred to as
"CAHs").  CAHs are limited to 25 beds, and operate in rural and generally economically
deprived and medically underserved areas of the United States.

28.     Unlike traditional hospital facilities that are paid under Prospective

11

Payment Systems (PPSs) through which Medicare reimbursement is fixed and capped,
Medicare pays CAHs based on each hospital's reported and allowable costs. Each CAH is
entitled, generally, to receive 101 percent (101%) of its allowable costs for outpatient,
inpatient, laboratory and therapy services, as well as post-acute care delivered via the
CAH's swing beds. Medicare pays for the same services from CAHs as from other acute
care hospitals, but CAHs' payments are not based on the types of service provided or the
number of services provided. Payments for CAHs are based on the costs they claim to
incur, and on the share of costs allocated to Medicare patients as distinguished from non-
Medicare patients. Stated simply, the more costs claimed by CAHs on their Medicare cost
reports, the more Medicare money they receive.

29.     CAHs report their costs to Medicare on Medicare Cost Reports (Form CMS
2552-96).

30.     Medicare cost reports submitted by CAHs contain a certification in Part I
that sets forth the following: "MISREPRESENTATION OR FALSIFICATION OF ANY
INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY
CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR
IMPRISONMENT UNDER FEDERAL LAW.  FURTHERMORE, IF SERVICES
IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE
PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE
OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION,

FINES AND/OR IMPRISONMENT MAY RESULT."

31.     Medicare cost reports submitted by CAHs contain an additional certification entitled "Certification by Officer or Administrator of Provider(s)" which reads as follows: "I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." This language is followed by the signature of the facility's officer, that officer's title and the date on which the cost report is submitted.

32.     Medicare generally pays CAH's 101% of inpatient costs, outpatient costs, laboratory costs, therapy services, and post-acute care in swing-beds. Inpatient costs in particular are paid by Medicare on the basis of an average reported cost per day.

33.     Because CAHs are paid 101% of costs, Medicare payments increase as CAHs report higher costs or expenses on their cost reports. Medicare does not set a particular monetary ceiling on CAH costs.

34.     Medicare uses the costs reported by CAHs on their cost reports to set daily reimbursement rates for inpatient and swing bed services. Costs reported in one year are used by Medicare to set the daily reimbursement rates for the next year.

35.     Medicare has by federal regulation established rules and guidelines for the reporting of costs by CAHs and other providers who submit their costs through Medicare cost reports.

36.     To be properly and lawfully reimbursable by Medicare, costs reported on Medicare cost reports must be directly related to patient care.

37.     Compensation by Medicare for any services provided by a Critical Access Hospital or its ancillary services providers is allowable as a proper Medicare cost only to the extent the services are actually performed in a necessary function directly related to patient care and only to the extent that the compensation is in an amount that would ordinarily be paid for comparable services by comparable institutions.

38.     A Medicare provider seeking reimbursement for costs through a Medicare cost report must disclose on its cost report the identity of any related parties with which it has done business. Parties are related not only when they have the same owner, but they also are related when the owner of a company does business with a company over which that owner exercises control - whether through ownership, a contractual agreement, or the mere realities of the business arrangement.

39.     When a Medicare provider incurs costs as a result of its dealings with a related party, Medicare does not pay the Medicare provider the full amount charged by the

14

related entity.  A Medicare provider reporting related party expenses on its Medicare cost reports is permitted to report only the amount it actually cost the related party to provide the service, not the amount charged by the related party.

40.     Medicare providers may include on their Medicare cost reports only the expenses associated with providing medical care, such as physical therapy, for example, that is medically necessary and reasonable.  Costs arising from medically unnecessary or excessive services are not to be included on Medicare cost reports.

41.     Medicare relies on the presumed truthfulness of the information disclosed in a CAH's Medicare cost report in determining the amount of reimbursement to be paid to that CAH.  The presumed truthfulness of that information is therefore material to, has a natural tendency to affect, and is a condition of entitlement to be paid for, any claim by any CAH for any Medicare payment (and any consideration by Medicare of any such claim).

42.     Each of the Hospital Defendants named in this case is, and was during all times relevant to this case, a Critical Access Hospital (and thus a "CAH"), as defined above.

### Defendants' Cost Padding Scheme:

43.     Beginning in approximately 2005, Defendant Wade Walters offered to each of the Hospital Defendants, and each of the Hospital Defendants have accepted, agreements under which each of the Defendants fraudulently exploited the cost-based system of Medicare reimbursement of CAHs as described above, through millions of

15

dollars in payments by the Hospital Defendants to Walters (and the remaining Defendants who are not Hospital Defendants) for activities designed to pad and inflate costs, the amounts of which were falsely represented on the Hospitals Defendants' cost reports to Medicare as directly related to (and as necessary to) patient health care (but the central purpose and effect of which was to enrich Walters and the remaining Defendants other than the Hospital Defendants). All of those activities by all Defendants, as described in this paragraph and hereafter, shall be terms the "Defendants' Cost Padding Scheme."

44.     As a key part of the Defendants' Cost Padding Scheme, Defendant Walters, through Defendant Performance Accounts Receivable, LLC ("PAR"), which was owned and controlled by Walters, entered written agreements with the Hospital Defendants, not in order to provide services necessary to or directly related to patient care, but to create higher costs and thus higher Medicare revenues for the Hospital Defendants as an end in itself.

45.     Under such agreements, the Hospital Defendants engaged Walters and PAR to "develop and implement strategic plan(s) to restructure (the) hospital's operations to allow for maximum cost based reimbursement," pursuant to which PAR promised to provide "monthly operating reports demonstrating revenue generation."

46.     Hiring Walters and PAR for their purported expertise in "revenue cycle management services," the Hospital Defendants committed to make substantial payments to Walters and PAR to "develop new services and referral sources that will increase net

16

revenues" for the Hospital Defendants.

47.     In their joint and agreed efforts to boost the "costs" to be claimed by the Hospital Defendants as reasonable and necessary health care costs on their Medicare cost reports, the Hospital Defendants agreed to give Walters and PAR substantial managerial control over the hiring, nominally in the names of the Hospital Defendants, of numerous vendors and service providers purportedly to expand activities and thus costs related to inpatient activities, swing bed activities, rural health clinic activities, and psychiatric counseling services.

48.     The first such written agreement entered between Walters (and PAR), on the one hand, and a Hospital Defendant on the other hand, was entered in approximately 2005 between Defendant PAR and Defendant North Sunflower Hospital, under which Walters and PAR represented that they were "not just a billing and collection" company, but were instead a company with "expertise in whole revenue cycle" generation for "Critical Access Hospitals," and under which North Sunflower Hospital agreed to pay Walters and PAR an "initial rate" of seven percent (7%) of all receipts on behalf of that Hospital for all "swing-bed" and intensive outpatient ("IOP") services delivered by health care professionals.

49.     In confirming their joint purpose of increasing "costs" as an end in itself, Walters, PAR and the Hospital Defendants agreed that PAR (and thus Walters) would be paid a significant fraction of all revenue collected by the Hospital Defendants "as a result

of cost based settlements/lump sum adjustment from any third party payers," which all Defendants knew would be cost-based payments from the Medicare system to each such CAH. As an example of that contingency-fee compensation by the Hospital Defendants to Walters and PAR, PAR obtained an agreement in 2010 from the Pearl River County Hospital requiring that Hospital to pay PAR fully seven percent (7%) of all such revenue received by that Hospital from all inpatient and outpatient activities.

50.     By agreeing to link their payments to Walters and PAR directly to the amount of Medicare revenue collected by each such CAH, each such Hospital Defendant left no doubt that it was engaging Walters and PAR to increase revenues as an end in itself, rather than to cause an efficient expenditure of costs actually necessary to patient care (as required by the Medicare laws described above).

51.     Defendant Walters, and thus the management of Defendants PAR and PCL controlled and operated by Walters, had never received any formal education or degree concerning, and had never been issued any license concerning, the provision of any health care service to patients, and indeed had never directly or indirectly rendered any such service to any patient admitted to any of the Hospital Defendants (or to any ancillary service of the Hospital Defendants).

52.     As a further and related part of the Defendants' cost padding scheme, Walters recruited, and caused Hospital Defendants to enter purported service contracts with, other entities who or which would be paid by the Hospital Defendants, not on the

18

basis of any reasonable or market value of services rendered for patient care, and not on

the basis of any services of any kind that they would render, but instead based on how

much those other vendors or contractors succeeded in increasing the reported costs (and

thus the Medicare revenues) associated with their area of hospital operations.

53.    Examples of such contingency-fee arrangements promoted by Defendant

Walters in order to increase his own contingency fee from increasing hospital "costs" were

agreements entered by Defendant Claryton V. Deardorff and Defendant Stepping Stones

Healthcare, with hospitals including Defendant Franklin County Memorial Hospital, in

which Stepping Stones was engaged by Defendant Hospitals to "develop" substantial

increased "costs" (and thus Medicare revenues) from the operation by the Hospitals of

geriatric intensive outpatient psychological therapy programs (called "IOPs").

54.    As a particular example of such contingency-fee arrangements promoted

by Walters and entered by Deardorff through Stepping Stones, Pearl River County

Hospital agreed at the urging of Walters, starting in April of 2011, to pay Stepping Stones

increased fractions of total Medicare gross revenues received from any IOP operation by

the Hospital itself, such that Stepping Stones was to receive 10 percent of "gross charges"

received "up to $250,000" from IOP operations, and then 32 percent of "gross charges"

received from those operations "in excess of $250,000," and then 40 percent of all "gross

charges" from IOP operations "in excess of $600,000."

55.    As with the Hospital Defendants' agreements with Walters and PAR to pay

varying fractional amounts depending entirely on gross receipts by the Hospitals from

Medicare, none of the agreements by Hospital Defendants with Deardorff or Stepping

Stone were intended or designed to compensate either of them for the value of services

directly related to or necessary for patient care. Indeed, Hospital Defendants' agreements

with Stepping Stones obligated the medical staffs and employees of the Hospitals, and not

employees of or providers to Stepping Stones, to be the exclusive providers of actual IOP

services actually delivered to Medicare patients.  Payments to Stepping Stones were

clearly designed to cause increases in reported "costs" and thus increases in Medicare cost-

based payments, rather than to cause health care services to be rendered to Medicare

patients.

56.     As all Defendants knew, all of the fractional payments made by the

Hospital Defendants to Walters (or to PAR), or to Deardorff (or to Stepping Stones), were

not made to compensate anyone for any activity necessary to or directly related to the

provision of health care services to patients. None of the amounts of any of those

payments should therefore have been included in the Hospital Defendants' "costs"

included on their Medicare cost reports.

57.     And yet, in order to achieve the core purpose of the Defendants' Cost

Padding Scheme, all such payments were intentionally included as "costs" on the Hospital

Defendants' Medicare cost reports, causing substantially higher payments to be made by

Medicare to the Hospital Defendants, and causing all such cost reports to be false

statements material to those payments and in order to get those payments made directly to the Hospital Defendants (and indirectly to the remaining Defendants, including Walters and Deardorff).

58.     Among the other vendors who Walters recruited to participate in, and who agreed to and did participate in, the Defendants' Cost Padding Scheme, was Defendant Dennis L. Pierce (hereafter, "Pierce"), and also Defendant Piercon, Inc. (hereafter, "Piercon"), which was owned and controlled by Dennis L. Pierce.

59.     Pierce and Piercon each agreed to participate in the Defendants' Cost Padding Scheme by agreeing to conduct various construction projects on the premises of the Pearl River County Hospital, and perhaps on the premises of Hospital Defendants' operations, and to charge non-competitive and exorbitant prices for such construction work (for which no competitive bids were solicited or taken), and also to split invoices for such work into multiple invoices of under $5,000 per invoice, in order to allow Walters and such Hospital Defendants fraudulently to evade a Medicare requirement that such construction expenditures in excess of $5,000 be treated as a capital project and be the subject of depreciations over time (and also to evade Mississippi statutes forbidding "split invoicing' to evade state bid laws governing the expenditure of State funds).

60.     Among the other vendors who Walters recruited to participant in, and who agreed to and did participate in, the Defendants' Cost Padding Scheme, was Defendant Wellness Environments, Inc. ("Wellness"), which sold to various Hospital Defendants,

often for installation by Defendant Piercon, pre-fabricated walls and other building

materials and structures for the construction or renovation of hospital patient rooms or

other clinical buildings, at exorbitant, non-competitive prices arranged for and accepted by

Walters as part of that Scheme in order to increase costs to be included in the Hospital

Defendants' Medicare cost reports.

61.     A further feature of the Defendants' Cost Padding Scheme was for

recipients of fractional revenue-based payments to "kick back" to other participants in the

scheme some of their resulting monetary receipts, in order to continue to induce such

recipients to continue to participate in the scheme. As an example of this pattern,

Defendant Deardorff agreed in 2011, with Walters and other managers of the Pearl River

County Hospital, that if IOP revenues reached a certain high amount, Deardorff with a part

of the proceeds from his fractional compensation "would make a large donation for the

planned new PRC Hospital Foundation." Deardorff later attempted to justify such a

kickback arrangement by assuring the successor hospital administrator, namely Relator

Vaughan, that "all (of) Stepping Stone's fees are cost-based," and that "the hospital

receives 101% of these costs."

62.     As a further example of that "kickback" pattern within the Defendants' Cost

Padding Scheme, Defendant Wellness paid to Pearl River County Hospital in 2011 an

amount of $20,000 as part of and in exchange for Wellness being awarded and paid for the

supply of modular room walls and structures at that Hospital, under the guise of funding a

"patient satisfaction survey" which in fact was never conducted and never incurred any such cost.

63.    As further examples of the same kickback pattern, Defendant Walters regularly paid for board members of Hospital Defendants to attend (and to observe through his "corporate skybox") various professional and collegiate sports events, and also to attend trips at no expense to the board members.

64.    Defendant Mike Boleware agreed to support, and actively participated in, the Defendants' Cost Padding Scheme, as and through his position of Hospital Administrator and CEO at Pearl River County Hospital, at Defendant Franklin County Hospital, and at Hardy Wilson Memorial Hospital (located at Hazlehurst, Mississippi), in part by allowing Defendant Walters to carry out the entire Cost Padding Scheme at such Hospitals and through false items on the Cost Reports of each such Critical Access Hospital.

65.    Defendant Hope Thomley agreed with Defendant Walters to support, and actively participated in and profited from, the Defendants' Cost Padding Scheme, by fraudulently using her position as an employee of Defendant PAR to cause Pearl River County Hospital to incur multiple expenses and enter multiple contracts, none of which was related to or necessary to the delivery of health care services to patients, but all of which benefitted Thomley financially (and all of which were falsely included as direct health care expenses on the Medicare cost reports of that Hospital). Those transactions

23

included payments by Pearl River County Hospital to Thomley of a salary apart from her salary from PAR, purchases by that Hospital of insurance policies as to which Defendant Thomley's husband was the commission-paid insurance agent, purchases by that Hospital of approximately $2,000 in Christmas decorations in November 2011 from a company owned or controlled by Thomley's husband, payments by that Hospital of over $6,000 to a company formed by Defendant Thomley and her husband for purported services including information technology consulting, and payments by that Hospital of personal expenses of Defendant Thomley charged on her personal American Express credit card.

66.     All of the payments made to Walters (and/or to PAR), and to Deardorff (and/or to Stepping Stones), directly or indirectly by the Hospital Defendants, all of which were based on or tied to the amount of "costs" (and thus Medicare revenues) which such persons caused to be incurred by or increased to any such Hospital Defendant, were knowingly and willfully offered, solicited, paid and received by the Defendants as remuneration in return for arranging for and recommending or ordering services and expenditures for which they knew and intended that cost-based payments would be made to the Hospital Defendants by the Medicare system, in violation of the Anti-Kickback Act (AKA) as described above.

67.     All of the increased costs which were caused by Walters (and/or by PAR), or by Deardorff (and/or by Stepping Stones), or by Wellness, resulted from the AKA violations described above, for which the Hospital Defendants knew that they had no right

to be compensated by the Medicare system, and which they further knew they had no right to regard as lawful or necessary "costs" on their Medicare cost reports. For that reason, inclusion of such costs on those reports by the Hospital Defendants rendered those reports knowingly and materially false statements, which caused Medicare to make (and to substantially increase the amounts of) payments to the Hospital Defendants.

68.     In the course of and for the purpose of padding the "costs" to be reported by the Hospital Defendants on their Medicare cost reports, Defendant Walters routinely caused Defendant Performance Capital Leasing, LLC, which he owned and controlled, to "lease" to the Hospital Defendants modular buildings, medical equipment, vans, and other properties, at exorbitant leasing rates designed to increase the Hospitals' "costs" and thus further to achieve the purpose of the Defendants' Cost Padding Scheme.

69.     Because the Defendants all knew that compliance with the AKA was material to and a prerequisite to the Hospital Defendants' entitlement to any payments from Medicare, all payment claims submitted for all Medicare payments by all of the Hospital Defendants throughout their participation in the Defendants' Cost Padding Scheme were known by the Defendants to be legally and factually false claims made in violation of the FCA.

70.     Because the Defendants all knew that costs could not lawfully be included in the Hospital Defendants' Medicare cost reports if they were not necessary to, and were not expended directly for, the delivery of health care services to patients, or if they were not

reasonably incurred and priced for that purpose, and because such Defendants further knew that the accuracy of the cost reports was material to (and a prerequisite to) the Hospital Defendants' entitlement to any payments from Medicare, all payment claims submitted for all Medicare payments by all of the Hospital Defendants throughout their participation in the Defendants' Cost Padding Scheme were known by the Defendants to be legally and factually false claims made in violation of the FCA.

71.     All cost-based claims made by the Hospital Defendants throughout their participation in the Defendants' Cost Padding Scheme were made directly by the Hospital Defendants, and were caused to be made by each of the remaining Defendants herein (including Walters, Deardorff, Thomley and Pierce and each of the companies controlled by each of them, and also including Wellness), in violation of the False Claims Act, causing damages to the United States in the amounts of all such cost-based payments, none of which would have been made if Medicare payment officials had known the truth about the Defendants' Cost Padding Scheme.

## COUNT I

### Claims By and on Behalf of the United States for Making False Claims (and for Causing False Claims to be Made)

72.  Plaintiffs re-allege and incorporate by reference paragraphs 1 through 71 as though fully set forth herein.

73.  This is a claim under the False Claims Act,  31 U.S.C. §§ 3729-33, as amended, against each of the Defendants herein.

74.  The Plaintiffs/Relators have standing to maintain this claim by virtue of 31 U.S.C. §3730(b).

75.  By virtue of the acts described herein, each of the Hospital Defendants knowingly presented false or fraudulent claims for payment, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1), and as amended in 2009 and codified as 31 U.S.C. § 3729(a)(1)(A).

76.  By virtue of the acts described herein, each and every one of the Defendants knowingly caused to be presented false or fraudulent claims for payment, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1), and as amended in 2009 and codified as 31 U.S.C. § 3729(a)(1)(A).

77.  By virtue of the false claims caused to be presented by the Defendants, the United States has suffered actual damages and is entitled to recover three times the amount which it paid in response to such false claims (and therefore the amount by which it is damaged), plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims caused to be presented, and other monetary relief as appropriate.

## COUNT II

**Claim By and on Behalf of the United States for Causing False Records or Statements to be Used to Get Paid, and/or Which were Material to, False Claims**

78.  Plaintiff re-alleges and incorporates by reference paragraphs 1 through 71 as

though fully set forth herein.

79.  This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, against Accretive.

80.  The Plaintiffs/Relators have standing to maintain this claim by virtue of 31 U.S.C. §3730(b).

81.    By virtue of the acts described above and the Defendants' uses of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the Government, and otherwise the Defendants' acts causing false records and statements to be used which were material to false or fraudulent claims made by the Hospital Defendants, the Defendants made and used false records or statements to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(2)(as codified before 2009 amendments), and also caused to be made or used false records or statements which were material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B)(as codified pursuant to amendments to the FCA in 2009).

82.    By virtue of the acts described above and the Hospital Defendants' uses of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the Government, and otherwise all of the Defendants' activities causing false records and statements to be used which were material to false or fraudulent claims, all of the Defendants herein caused false records or statements to be

28

made and used to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(2)(as codified before 2009 amendments), and also caused to be made or used false records or statements which were material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B)(as codified pursuant to amendments to the FCA in 2009).

83.     By virtue of, and as a result of, the false records and statements used to get false claims paid by the Government, and/or which were material to any entitlement to any such cost-based payments, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT III

### Claims By and on Behalf of the United States for Conspiracy to Submit False Claims

84.  This is a claim under the False Claims Act,  31 U.S.C. §§ 3729-33, as amended, against each of the Defendants herein.

85.  Plaintiff re-alleges and incorporates by reference paragraphs 1 through 67 as though fully set forth herein.

86.  By reason of the foregoing with respect to Defendants' Cost Padding Scheme, each of the Defendants agreed and conspired with one or more of the Hospital Defendants to participate in that Scheme and thereby to defraud the government in order to get false or

29

fraudulent cost-based claims paid by Medicare, in violation of 31 U.S.C. § 3729(a)(3), and

in violation of 31 U.S.C. § 3729(a)(1)(C) as amended in 2009. In furtherance of the

conspiracy, and through each of the particular activities described above, each of the

Defendants acted overtly to affect the objects of the conspiracy alleged herein.

87. By virtue of the false claims presented or caused to be presented by the

Defendants pursuant to this conspiracy, the United States has suffered actual damages and

is entitled to recover from Accretive three times the amount by which it is damaged, plus

civil money penalties of not less than $5,500 and not more than $11,000 for each of the

false claims presented or caused to be presented, and other monetary relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in

favor of the United States:

1.    On Counts I - III, under the False Claims Act, against each of the Defendants

herein, for treble (i.e., three times) the amount of the United States' actual damages

(including investigative costs), plus civil penalties as are allowable by law for each false

claim or record and for all costs of this civil action;

2.    For all costs of this civil action, including all investigative and expert

expenses incurred herein; and

3.    For such other and further relief as the Court deems just and equitable.

WHEREFORE, Relators Mitchell D. Monsour and Walton Stephen Vaughan

hereby demand and pray that judgment further be entered in their favor:

1.      On Counts I - III, under the False Claims Act, for a percentage of all civil

penalties and damages obtained from any of the Defendants pursuant to 31 U.S.C. § 3730,

reasonable attorney's fees, investigative costs, expert witness fess incurred, and all costs

incurred in pursuing these claims against the Defendants; and

2.      Such other relief as the Court deems just and proper.

This the 8th day of February, 2016.

                                        Respectfully submitted,
                                        MITCHELL D. MONSOUR and
                                        WALTON STEPHEN VAUGHAN,
                                        By their Attorneys,
                                        PIGOTT & JOHNSON, P.A.

                                        By: _____
                                                J. Brad Pigott

J. Brad Pigott, Mississippi Bar No. 4350
PIGOTT and JOHNSON, P.A.
775 N. Congress Street
Post Office Box 22725
Jackson, Mississippi 39225-2725
Telephone:  (601) 354-2121
Facsimile: (601) 354-7854
Email: bpigott@pjlawyers.com