## AMENDED DEPOSITION SUMMARIES

### Summary of Deposition of David Williams, August 29, 2016, EXHIBIT A

Williams was asked by counsel for PRCH to look at the reimbursement as it related to a Critical Access Hospital. Williams looked at Medicare reimbursement and how it was reported. [p.17] Williams made request for additional documents on the time studies and asset listing but did not receive them from counsel for PRCH. Williams was not aware that the PRCH Board specifically reviewed Petro's findings in the 2011 and 2012 cost reports. Williams never reviewed the PRCH Bylaws.  [p. 139-146]

Williams has no facts, witnesses or documents to support his opinion that there were no job descriptions for any of the people employed by PRCH in 2010 through 2014. [p. 139-146]

The PRCH Board is solely legally and morally responsible for the conduct of PRCH. The Board made the decision to hire PAR. Par was not responsible for the preparation of the cost reports.  [p. 139-146]

Williams was not aware that the Board made the decision not to complete the Wellness/Kingsbridge project. Williams was not aware that Thomley acted on behalf of the Board, and that Thomley went to Tallahatchie to review the Wellness project and report back to the Board.  Williams was not aware that Thomley was tasked to get quotes on financing the Wellness project.  In the opinion of Williams, Wade Walters and PAR were not responsible for reviewing how Tallahatchie incorporated the Wellness project, and Par was not paying Thomley as their independent contractor for such work.  Williams did know that the Board specifically approved Hope's salary. [p. 139-146]

Williams never saw the contract for the medical director of the IOP, and am not aware



EXHIBIT
3

that the contract called for her to separately bill all of her own clinical patient encounters under Part B or to permit the hospital to do it for her and that all of the other time she spent would be administrative [p.150], and Williams merely speculated that 100% of the time was non-administrative. [p. 152-153]

Williams was not aware that Joe Stevens stated to the Board that there was no violation of the Mississippi bid laws in 2010, 2011 and 2012, but that is an important fact. [p. 154] As to the allowance of administrative expenses for the ER director, I was not aware that this hospital didn't even have an ER department until just immediately before it became a critical access hospital. With no ER in operation they would had to start from ground zero, and the person that was hired as a medical director for the ER would have had to create all of the policies and produces and the rules, meet with the nursing staff, and spend a tremendous amount of administrative time getting that hospital up and running as a safe and proper ER for the Poplarville and Pearl River County community. [p. 156-160]

Williams never saw Marty Carr's contract as the ER physician, and he did not know that the ER contract had the provision to keep the time studies for the hospital for the allocation of Carr's time. It was PRCH's responsibility to keep up with that. It was not the responsibility of PAR or Wade Walters to do so. The accounting staff at PRCH was woefully inadequate, didn't keep proper records and did not even balance the checkbook, and that it was not the fault of Walters or PAR, instead it was the hospital that was responsible, with the Board of Directors overseeing, and getting timely, correct reports on a monthly basis at their meetings. Williams merely assumed 100% of the medical director's fees for IOP was not administrative. [p. 156-160]

Williams admitted that he is not opining that the Hospital suffered any damage in this

case regarding Medicare payments, cost reporting, and repayments, instead what happened in this case is that a rate was set by Medicare that turned out to be too high. Medicare then paid too much to the hospital that was a brand new critical access hospital for two years and then asked that the overpayments be sent back . That's not damage.  It's just a repayment of amounts that were overpaid.  [p. 156-160]

Williams was not aware that the vans were used to transport both nursing home patients and patients of the hospital, at this critical access hospital, to other regional facilities, like Forrest General Hospital, to obtain services that they couldn't get at PRCH, but if he had known, his opinion is that those would be reimbursable Medicare expenses on the Cost Reports.  This would have been an important consideration. [p. 162-171]

Mr. Petro was independent and was not controlled by Wade or PAR. Petro booked the Wellness project as an operating lease and put it on the cost report. [p. 162-171]

Steven Vaughan signed all cost reports and verified the following: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under Federal Law.  Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."   Vaughan also signed a certificate that says: "I hereby certify that I have read the above certification statement and that I have examined the accompanied electronically filed or manually submitted cost report and the balance sheet and statement of revenue and expenses prepared by Pearl River County Hospital, and to the best of my knowledge and belief, the report and statement are true, correct and complete and prepared from the books

and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of healthcare services and that the services identified in the cost report were provided in compliance with those laws and regulations." Vaughan signed amendments that specifically stated there were no related parties related to PRCH. Therefore, Walters and his companies were not in control of the Hospital and the Hospital admitted that. If Walters or his companies had controlled PRCH, the Hospital was required to state on the Cost Reports that Walters was a "Related Party." [p. 162-171]

Williams never looked at any records from Wellness that were supplied to Thomley, Wade Walters, the Hospital Board, or Mike Boleware, with regard to the Wellness program and why it was movable equipment with a 10-year depreciable life that was subject to operating lease approval by Medicare intermediaries, and never saw the Wellness tax opinions. What Petro did was appropriate in treating this as an operating lease with a 10-year useful life. Williams never looked at the Wellness materials that specifically explained what the components were. [p. 162-171] It would not be blatant disregard of Medicare rules for people who received and reviewed the Wellness package to rely on it, and in his opinion, it would be a reasonable action on their part. [p. 174]

Drew Weisinger, formerly with the same Horne accounting group as Williams, went to Tallahatchie Hospital to review the Medicare treatment of the Wellness room renovation at Tallahatchie Hospital. Weisinger relied on those same tax opinions for the Wellness project that the Wellness rooms were depreciable equipment subject to a 10-year useful life, and appropriated it as a 5-year operating lease. [p. 182-183] PRCH declared an emergency when the PCL vans

were being taken away after the lease was terminated.  A Critical Access Hospital  has to have transportation, and that's a reimbursable expense. [p.179-180]

The fair market value of the Wellness equipment would have a value of a 10-year lease. Donna Mitchell, the new CFO of PRCH, erred in failing to recognize that the Wellness equipment has a 10-year useful life, rather than only 5-year, and she used the wrong borrowing rate because FASB 13 specifically says that you have to look at the lessee's incremental borrowing rate.  Mitchell's FASB calculation of 4.995% was wrong, and Williams admitated that he erroneously relied on it. [p. 186-188]

### Deposition Summary of Craig Steen, September 22, 2016. EXHIBIT B

June 6, 2014 is the most up-to-date (and final) copy of the report; witness has no plans to submit another report. [p. 10-11]

Steen was not asked to look at anything other than the forensic work papers that BKD collected. [p. 12-14]

Steen has not done any supplemental reporting in the two years since the June 6, 2014, report, has no additional information, and, therefore, he has no additional opinions. [p. 16-17]

As to the Kingsbridge Lease, Steen erroneously assumed that over the initial five years of the lease, Pearl River would pay around $1.9 million for what he assumed were under a $1 million in assets; however he did not have enough information, so he couldn't definitely say there was a problem on the cost report.   He didn't have all the info to make a complete analysis of it. In the absence of that info, witness simply offered no opinion with regard to claiming of Kingsbrige lease payments by the hospital on its cost reports. [p. 20-22]

Quinn gives Appendix A to witness and points out total estimate of probable cost is

$1,590,785. Witness again affirms Appendix A would have been helpful in answering the questions he had in this note. Witness confirms there is nothing inappropriate about seeking reimbursement for architectural/construction costs or billed-out costs for the installation of equipment. He agrees the equipment appears to be $1,590,785, not $1 million as he erroneously assumed in his report, pages 20-2x. [p.27]

Kingsbridge's lease rate appeared reasonable to Steen. [p. 30-31]

Steen hasn't seen anything that led him to believe the hospital was under the impression it was purchasing something instead of leasing it. [p. 32-33]

After looking at Schedule 1 of the Kingsbrige Lease during his deposition, Steen admits tht PRCH has the option to return or buy the Wellness equipment. Based on his review, Steen admits the Kingbridge Lease appears to be a true operating lease. [p. 37-41]

Steen satisfied himself that it was an operating lease. He was satisfied there was no problem with the Kingsbridge lease as reported on the original PRCH Cost Reports as an operating lease. [p. 40-41]

Regarding the PRCH claim that Hope Thomley was a PAR employee who was also on the hospital payroll, Steen says the Cost Report preparer should have talked to the hospital CEO or CFO to discuss it and get the appropriate information; however, this was not done here. [p. 43-44]

"In and of itself," it is not improper that Thomley worked for both the hospital and PAR. [p. 45-46]

Steen agrees that Thomley had expenses paid to her, but there is no idea what those expenses were, and likewise the cost report preparer should normally go back and ask the

Hospital CEO or CFO or Thomley what these expenses were for. If documentation was provided, he says the expenses might be allowable. Steen admits he was not asked to do that here. He affirms that the only additional thing he would need to feel comfortable about these expenses is to know exactly what they were for, and answers that generally, the employee who made the purchase would provide this. [p. 46-49]

Steen opines that it is not against Medicare regulations for Thomley to have two separate jobs. The Hospital Board asked Thomley to go to Tallahassee, MS to review the Wellness room and make a recommendation to the Board as to whether they should contract with Wellness. Steen agrees he would expect the hospital to pay for the services she provided if the Board asked her to go. He agrees if she was working for the hospital, she should expect to be paid by the hospital.

With regards to the medical director of the IOP program: Witness affirms that he stated that part of the agreement is that the hospital would pay for the actual expenses of the medical director. It is not uncommon to have to go back and get that documentation at the end of the fiscal year. It is "very possible" that the medical director for IOP did some administrative work which would have been allowable in the cost report. [p. 77-79]

As to the PRCH Off-Campus Clinic, Steen does not know if the clinic had separate billing clerks or a separate administrator. The separate clerk's or administrator's time is all in the clinic, so it would be allowable as an expense on the Cost report as originally reported. [p. 53-55]

As to the statistical error on Worksheet B1, Steen says someone put the wrong number there, but he has no way of knowing if it was by accident or on purpose. He has no opinion - just that it was error. [p. 55-56]

As to the allocation of For ER physicians as an allowable cost, Steen admits that it would have been allowable had it been administrative for adults/peds.  Steen did not review or ask anyone for the time studies to back up the allocation [p. 56-60], and Steen doesn't readily know how much of the ER time was allocated in other areas. [p. 60-61]

Steen affirms that there is nothing wrong with ER doctors working in different areas. Steen admits he was not charged with "trying to assign blame on or who did what" and has no opinion on it. [p. 62-63]

Also, as to allocation of the ER physician times could have been an area where reimbursement was not claimed by PRCH when it should have been."  Steen did not find out how those ER contracts were structured. [p. 68]

Steen didn't have enough info to say it was embezzling or not. No opinion. [p. 66-67]

As to the allocation of the ambulance cost, a small hospital like PRCH will often have to transport an inpatient to another hospital for a test they can't provide, and it is medically appropriate to transport them in an ambulance.  Therefore, his assumption is if PRCH shows ambulance costs as a reimbursable cost, he would have left those costs in the report. [p. 67-68]

Steen affirms that when he reviewed the 2011 and 2012 cost report in relation to this matter, he did not find any evidence that any entries on the cost reports were done "knowingly incorrect."  He has no knowledge of Medicare having made their determination either. [p. 69-70]

Steen's understanding is that Bobby Petro was the cost report preparer for 2011 and 2012. He has no evidence that Petro did not use his professional judgment and experience in submitting these cost reports. Steen agrees that if there were mistakes on the report, he has no reason to believe that Petro made those mistakes intentionally. [p. 76-77]

Regarding the Piercon invoices, Steen agrees that if a depreciable asset has a historical cost of less than $5,000, its cost is allowable in the year it is acquired. [p. 71-72]

Steen answers that the person responsible for the accuracy of the cost report is PRCH (not the cost report preparer). He agrees it was not PAR or Walters' job/responsibility to prepare an accurate cost report in this case, but rather the hospital's job. [p. 72-73]

Steen agrees that it is the hospital's job to maintain and provide documentation to support allocated costs to the cost report preparer. It is his understanding that the hospital had issues with maintaining proper books, accounting methods, and keeping documentation. Steen saw no basis to blame Walters or PAR for the hospital's failure to keep up its books. [p. 79]

Witness answers that he is not providing an opinion here or at trial as to any violation of state bid laws because he doesn't know the MS bid laws. [p. 80]

It is the hospital and preparer's job to determine whether there is sufficient documentation to submit an allowable cost to Medicare. Steen opines that Walters or PAR were not the preparers, and it wasn't their responsibility to do this. The hospital hired Petro to prepare 2011 and 2012 cost reports. He affirms they did not hire Walters or PAR to prepare the cost reports. He did not see that provision in PAR's contract that they would prepare the cost report. [p. 80-81]

The cost report preparer has to rely on the documentation that is provided to him by the facility. [p. 82-83]

Steen admits that he cannot say any damage has been done to PRCH by PAR, Walers or PCL by the requirement that PRCH is required to repay money to Medicare. That is speculation. [p. 86]

**Deposition Summary of Tony Cawiezell, January 12, 2017, EXHIBIT C**

The Kingsbridge contract was an operating lease that would be subject to reimbursement by Medicare as an operating lease.  [p. 33]

The lease payments would be an allowable cost versus capitalizing and depreciation and interest costs of ownership. [p. 44]

The hospital has the responsibility for the cost report.  [p. 46]

If the vans were used for transporting to another hospital for a service that PRCH did not have, that would be reimbursable cost.  [p. 59]

Hope Thomley's expenses for Christmas decorations if used around the hospital would be reimbursable expense.  [p. 60-61]

Cawiezell agrees with Mike Nichols' report and it is consistent with his opinions and conclusions.  [p. 86]

A "related party" is either someone can exhibit control over another party, or there's family relationships.  Steve Vaughan certified on the Cost Reports that PRCH had no related parties.  [p. 92]

The following facts and documents confirm and support that neither Walters nor any of his companies were "related parties" and therefore they did not have "control" over the operation or management of PRCH:

1.  The PAR contract did not allow Mr. Walters or his companies control over PRCH.  [p. 93]

2.  The Bylaws of the Board of Trustees of PRCH (Exhibit 813) state that "The board of trustees is legally and morally responsible for the conduct of the hospital/nursing home, accomplishments of its objects and purposes, and the discharge of its responsibility to the patients/residents, to the community and to

Pearl River County, Mississippi, and its board of supervisors." That places the legal and moral responsibility for the acts that are in controversy here on the Board. The Bylaws contain no provision allowing the Board to delegate any of those powers. [p. 94-95]

3.   In Section 2, the Bylaws say that the board of trustees shall exercise and discharge full authority, power, and responsibility to operate and maintain the hospital. That supports the fact that it was only the hospital board of directors that had the power to run the hospital, not Mr. Walters or anybody else. [p. 95]

4.   In Section 5, the Bylaws say the board of trustees shall be responsible for satisfactory compliance with all federal, state, and local laws and regulations, which would include the Medicate laws, rules, and regulations. [p. 95-96]

Article VII of the Bylaws provides that the board of trustees shall select and employ competent administrator in order that the hospital and nursing home avail itself of all federal and state medical assistance programs and benefits. That means that PRCH should do everything within its power to reasonably obtain all monies from the Medicare program that it can to support its existence and to fill the needs of the Pearl River County community that it serves. [p. 96]

Article VII, Section 2, Authority and Responsibility of Administrator, the administrator is hereby granted and delegated the following powers, authority, and responsibility. . . . Authority in the employment, retention, promotion, discharge of all employees of the hospital, excluding certain physicians . . . and to fix salaries and rate of pay and grant increases and reductions from time to time. That gave Boleware the full right, power, and duty as delegated by the bylaws to give Hope Thomley increases without approval of the board. [p. 97]

In Cawiezell's opinion, It is justified having 80% of the IOP physician attributed to administrative expense, or Part A as opposed to Part B, under Medicare as originally reported on the PRCH Cost Report. [p. 99-100]

Cawiezell saw nothing that Walters or PAR did or had a duty to do that was contrary to Medicare laws, rules, and regulations. Mr. Walter's opinion that the Kingsbridge contract was an operating release was correct. [p. 101]

There's no question that Hope Thomley, who also served as an employee of an independent contractor, was performing separate duties as the chief operating officer for the hospital and the expense for her was an appropriate expense on the Cost Report. [p. 104-105]

Cawiezell did not see any conclusive evidence that Thomley acting as COO compensation was duplicative of PAR Consulting Services or that her compensation was unreasonable. [p. 105]

There is nothing in the PAR contract that says that Hope Thomley or anybody at PAR was to do any of these things that the board was calling upon her to do, such as going to Tallahatchie to look at the installation of the modular rooms that Kingsbridge financed. [p. 105]

Pearl River County Hospital had problems with lack of internal controls over the entire payroll function. The accounting and payroll departments were a mess in 2010, 2011, and 2012. [p. 106]

The PRCH Board of Directors breached their responsibility to have true and accurate financial records upon which to base their Medicare reports. Mr. Walters was not responsible for any of these problems. [p. 110]

There's no evidence that anyone made any knowing or intentional or fraudulent violations of the Medicare laws, rules, or regulations in filing the cost reports. They were doing the best with what they had to work with. [p. 111]

With regard to the medical director of Stepping Stones, it is not unusual for the medical

director to spend substantially all of his or her time performing administrative duties and very little direct patient care Part B services. The medical director separately billed her own patient care services under Part B totally outside the realm of the hospital. The Medical Director fees for IOP or the costs which were property deductible on the medical cost. [p. 112]

When Cawiezell spoke with Mike Boleware (former CEO during the time in question), Boleware told Cawiezell he was never asked to prepare any statement regarding the time allocated for administrative duties by the IOP Medical Director prior to those costs being removed from the cost report by Steven Vaughan and the new administration. In Cawiezell's opinion, the hospital should have taken every step, including contacting Mike Boleware, to get such an Affidavit in order to preserve their maximum Medicare cost reimbursement as originally filed. [p. 113]

### Deposition Summary of K. Michael Nichols, January 19, 2017, EXHIBIT D

Nichols is a partner with RSM US, LLP and Exhibit 817 is the Expert Report of Nichols. [p. 6, 30]

The Kingsbridge lease does not meet any of these criteria under the four tests of Exhibit 18 - Section 110, Sale and Lease Back of Lease Purchase Agreements. Therefore, the Kingsbridge lease is a lease. It is not capitalized, and thus, lease payments are allowable costs on the Medical Cost Report when paid. [p. 50-51]

Nichols defines "related party transaction" as referring to "costs being reflected in a hospital's cost report that are procured through an organization that is either related by ownership or control to the hospital." By "control," witness means that the entity that supplies the cost has the ability to control the organization. [p. 56-57]

Hospitals are required to use AHA Useful Life Guidelines for depreciable assets. The Wellness equipment that is identified in the lease would fall in the category that would be consistent with "equipment", because it was movable or removable. [p. 112-113]

Nichols relied upon the indemnity section of the Amendment to the Kingsbridge lease to determine the FMV of the Wellness project to be $2 million. [p. 123]

PRCH Board had that ultimate responsibility for cost reports and related parties. [p. 127]

On both Amended Cost Reports, PRCH certifies that there are no related parties transactions. In Nichols' opinion there is no documentation to support the allegation that Par or Walters were related entities to PRCH. [p. 129]

According to the Bylaws, the ultimate responsibility for the Cost Reports is vested in the Board of Trustees. [p. 130]

Based on the assumption that PAR was terminated by the Board and not paid, that would be further evidence that PAR and Walters did not have control of PRCH and they and were not "related parties". [p. 130-131]

There are no facts, witnesses or documents that would indicate that Wade Walters or PAR did anything to defraud PRCH or to violate Medicare laws, rules and regulations. [p. 135]

**Deposition Summary of Jeffrey R. Roberts, September 23, 2016, EXHIBIT E**

Roberts' report, Exhibit 806, dated May 31, 2013, is the report he submitted to the hospital. Roberts never issued a final report; and Roberts has no plans to do so unless someone asks for it. The May 31, 2013, report labeled "Forensic Accounting-Phase I Report" encompasses all the opinions he will give at trial. [p. 8-9]

Roberts has no opinions about whether the hospital appropriately characterized the lease

payments made to Kingsbridge on its Medicare cost reports. [p. 21-22]

Roberts' role in this case "was just this forensics project." The Board administrator approached them and said, "We've got some concerns about various contracts and issues. The scope of his report was merely gathering facts, pieces of information to help PRCH and make decisions. [p. 24-28]

Roberts didn't contact other former trustees because his report was merely an initial look at some issues. [p. 50-52] Roberts is not an expert in Medicare cost reporting. [p. 41]

Roberts has never reviewed any depositions in this case. Witness affirms he has not been asked to review any depositions and he doesn't plan to review them. [p.54-55]

As to the agreement with PAR for a fee equal the 7 percent of monthly corrected revenue, Roberts answers that he does not have anything one way or another to suggest the 7% fee was inconsistent with industry standards. Roberts believes this contract was approved by the hospital.[p. 55-56] Roberts says he is not offering any opinions about the 7% fee in the PAR contract. He affirms he is not offering any opinions about whether this was an appropriate or inappropriate contract. [p. 91-92] He does not remember finding any improper relationship between PAR or Walters and former Board members. He has no opinion as to whether PAR performed its services under the contract. He has no facts, witnesses or documents to suggest that any of the leases with Performance Capital were not fair market value for those lease rates and adds that he has no opinion about that. [p. 55-56]

Regarding the concern, #12 on page 4 of his preliminary report which states "The Board approved a building lease in April 2011 for the Primecare Clinic located in Purvis, Mississippi. The lease has a ten-year term at a rate of $14 a square foot, a rate that exceeds what one real

estate agent contacted by PRCH opined should have been closer to $10 per square foot." Roberts

says this was just to raise the issue to investigate further in a later report.  Roberts has no opinion

as to whether the $14 per square foot was reasonable. [p. 58]

Roberts has no opinions as to whether PAR or Walters should be blamed for the

weaknesses in the payroll process.  Roberts admits that the scope of his work was not to affix

blame, and he expresses no such opinions.  It is not his opinion that the "generally poor

condition" of the accounting records were caused by Walters or PAR. That is why his report

states "Inclusion in this report should not necessarily be interpreted to mean that we found them

improper."  Instead, he merely provided some information about some concerns raised by the

Board. [p. 59]

Roberts has no opinion as to whether Walters and his company should be blamed for the

Board failing to receive a second bid on certain contracts including the PAR contract. [p. 65]

Roberts does not know if Stevens approved the PAR contract. [p. 66]

Roberts is not rendering any opinion as to whether PAR provided services to the

standards of the contract.  He has no opinion. [p. 66-67]

Roberts has no opinion about the $125,000 loan that Walters made to PRCH to help with

cash flow.  Concerning conflict of interest, he replies, "I don't have an opinion, one way or the

other." He has no criticism. [p. 68-69]

Roberts doesn't know if a hospital's current financial status must be taken into

consideration in determining if a hospital's execution of any lease or contract is reasonable.  He

is not providing any opinion as to the reasonableness or fair market value of leases. [p. 70]

Roberts did look at the PAR contract as part of his report. [p. 73]

Page -16-

Roberts answers that he is not assigning blame for payroll problems to Walters or PAR in his forensic accounting. [p. 76]

P. 3, #4 on report: Roberts agrees his report states, "Computers belonging to certain former [sic] employees are in the possession of the Mississippi State Auditor's Office." He never received or had access to them. He agrees he has no opinion to offer on computers at present. [p. 87-88]

Roberts admits he does not have an opinion as to its appropriateness of Hope Thomley working for PAR and for PRCH. [p. 88]

Roberts admits he does not have an opinion on whether or not it is inappropriate. The same goes for the Christmas decorations. [p. 88-90]

Roberts does not know anything about Mississippi bid laws or how they relate to these issues. [p. 91]

Concerning Roberts' main concern with #8 and its subparts, Roberts admits that he was merely making the Board aware of these transactions and making sure the Board understood all of that. He has no opinion that they were inappropriate. [p. 91-92]

Roberts agrees he found nothing that appeared inappropriate when reviewing selected expense reimbursements to Boleware. [p. 105]

### January 29, 2016, Summary of Deposition of Steve Vaughn, EXHIBIT F

Exhibit 468 - letter from Taliaferro Oates (VP for Wellness). Letter says all issues regarding tax opinions from third-party accountants between 2004 and 2010 showing that rooms were equipment that was to be listed on cost reports as equipment (and not capitalized) were sent and it was based on a 10-year weighted life under MACRS; because it was moveable, reusable,

does not damage the building or wall system, it's not integral to the load-bearing part of the building, it is storable and re-sellable and Wellness Environments' intermediary precedent shows that CMS had previously approved it, just as the accountants in the reports that Wellness had obtained said: namely, the Wellness Project was appropriate on cost reports to be treated as equipment, not capitalized, that they had a 10-year taxable life for IRS purposes in CMS, and that Wellness was the single-source provider because they had a patent. [p. 953-954]

Vaughn does not recall reviewing Exhibit 151 or 139 (January 2012 update confirming same facts) at any point prior to this lawsuit.  McHard asks if it is correct that if the hospital had these docs, they should have been provided to the fiscal intermediary regarding the cost reports for 2011 and 2012 to legitimize the way the costs for that project were originally reported. Vaughn says they could have been provided to the current fiscal intermediary.  McHard asks if they should have been in order to save the hospital a lot of money.  Vaughn answers, "They certainly could have been." [p. 957-958]

McHard asks if Vaughn had reviewed these docs before the amended cost reports were prepared for 2011 and 2012 if it would have been his opinion that the amendments should not have been filed on this issue.  Vaughn answers that if he had reviewed these before amended 2011 and 2012 were filed, he would have submitted them to the fiscal intermediary and asked if they interpreted Medicare guidelines the same. [p.959]

On November 11, 2012, Robert Petro (auditor and Medicare cost reporter for hospital) wrote to Steven Vaughn, "I'm going to print the contracts. . . with the Wade Walters group. Vaughn: "I know you will need to know what dollar amount to allocate into which categories on the cost reporting regarding Wade Walters' services in fiscal year 2011.  Please work through Joe

Stevens regarding this matter. [p. 968-970]

## Summary of Steve Vaughn Deposition, April 15, 2015, EXHIBIT F

p. 28,13-20:  Q.  The Board meeting minutes were maintained in your office.  A: Yes.  I was the document custodian for the documents of the hospital.

p. 29,21-23:  I had no reason to believe that the payments to Kingsbridge were not authorized.

p. 56, 8-11:  I do not recall the reason given by the Board for stopping payments.

p. 79,4-9:  I relied on Stevens to approve contract before I signed them. . .

p. 84, 24-25:  The Board kept changing cost report preparers.

p. 100:   All the rooms on the long hall were renovated at a cost of $4,980 each.

p. 127,17-25; p. 128, 1-3: I would not have signed the Cert. Of Authority on the Kingsbridge contract if I believed the contract with Kingsbridge had not been approved.  I would rely on Stevens to bring that to my attention, as the role of the board attorney.

p. 142: I did not work with Wade Walters in preparing the cost report for year end September 30, 2012.

p. 143: I contacted BKD because I had concerns over the previous year's cost report ending 2011.  I inherited a mess.

p. 152: We don't attach contracts to the Board of Trustees minutes to this day.

p. 165: PRCH stopped making payments to Performance Capital Leasing in September, but continued to use the equipment until March.

p. 169: On March 25 PRCH was still using the x-ray, defibrillator, the modular, and the vans leased from PCL.

p. 191, lines 15-18: Q. Are you alleging that the – any officer or agent of either Tallahatchie General Hospital or North Sunflower Hospital engaged in a conspiracy with Wade Walters to defraud Medicare?

p. 191, Lines 13-14: A. I don't believe I could answer that question. . .

p. 201-203: I didn't rely on Kingsbridge's or Walter's advice in the filing of the cost report.

p. 239: The books were quite a mess when I got there, and Dave Stuart said to me he didn't fully understand where he had put some of the expenses and why he was instructed to put expenses in various accounts. Financing would be one of my weaker areas in administration, and I never gave Dave any instruction.

p. 255-256: The hospital was forced to amend its cost report because we became concerned about missing contracts, and as I began to look at the cost report and the expenses that were included by our chief financial officer, we began to get concerned. . .

p. 387: Vaughn presented Stevens invoice for payment to the BOT for approval on January 29, 2013.

**Summary of Steve Vaughn Deposition, January 12, 2016, EXHIBIT F**

p. 735: Does cost reporting to Medicare fall within the umbrella of your responsibilities? I contract that out. I don't know how to do a cost report.

p. 738-740: I don't generally give instructions to accountants. Accounting is not my strong suit. I did give guidance to Bobby Petro for the 2012 cost preparation. I told him there were some charges and costs associated with the renovation project that I didn't "feel comfortable" being in the cost report.

742: Wade Walters didn't have any authority to tell Petro anything.

p. 745: I'm trying to figure out whether Mr. Walters was acting in concert with any other defendant in this case.

p. 746: Bobby was trying to educate me or tell me that Leasing of walls and headboards and things like that were legitimate leasing expenses and that he had talked to our leasing company, Kingsbridge, and that that was a common practice and it was a legitimate allowable.

p. 764: Exhibit 548.

p. 769-771: Vaughn understood at the time he signed the Certificate of Insurability (Exhibit 548) that there was a valid lease between PRCH and Kingsbridge.

p. 780-781: I was relying on Joe Stevens.

p. 807-810: Exhibit 559-January 4, 2013 email from Steven s to Kingsbridge confirming Stevens does not dispute the obligation to reimburse Kingsbridge for tax payment, and that subsequent monthly payments will be processed over the next few weeks to catch up these payments.

p. 832: At the time the work was suspended, Wellness was willing to complete the project, and PRCH would have received some type of money for those completed rooms.

p. 871-872: Petro stated that Wellness said Medicare approved the Wellness equipment as expensable items.

p. 893-894: Section 3 of the Bylaws provides that the Board of Trustees is legally and morally responsible for the conduct of the hospital.

p. 895: The Board of Trustees, as set forth in Section 5 of Article III, is responsible for satisfactory compliance with all applicable federal and state laws.

p. 896: Vaughn relied on the advise of Stevens and McDonald for review of contracts before approval by BOT.

P. 904, line 21-25:  Q.  With regard to all of these leases with PAR that you're now objecting to, how do you know if there were - if those charges were fair, reasonable, usual, ordinary and customary?

p. 905, line 4:  Q.  So you don't know, do you?

p. 905, Line 5:  A.  I didn't do them.

p. 908, lines 8-12: Q have you had made any reports to Medicare as to the impropriety of paying all of these other payments to contracts that you claim now are not properly spread on the minutes?

p. 908, Line 17: A.  Not to my recollection.

p. 908, Lines 22-23: A.  I have no  proof.

p. 911-912: Vaughn has never done any Medicare cost reporting.

p. 916, 918: Vaughn admits that computers and accounting are not his strong suits and he does not know facts, witnesses or documents to prove when, who, and what documents were erased from hospital records.

p. 930: Vaughn has no facts, witnesses, or documents to support that PAR or Walters improperly took any documents from PRCH.

p. 930, lines 4-8: Q Do you have any facts, witnesses, or documents to support that anybody related to PAR or Wade Walters improperly took any documents from the hospital at any time?

p. 930, Lines 9-10:  A.  I don't recall that I have those at the moment.

p. 934, Lines 13-16: Q.  Are you aware of any contracts that you can specify that were signed by Mike Boleware that were improper and contrary to proper administration of the hospital?

p. 934, Line 20: A.  I can't recall at the moment.

### Summary of Robert Petro Deposition, August 13, 2014, EXHIBIT G

Petro did audits for 9-30-10, then 9-30-12 (did not audit for 2011). Prepared Medicare reports for PRCH and Medicaid reports for the nursing home for '10, '11, and '12. [p. 11]

Petro testified that he needed information from the hospital to prepare the cost report. Got most of his information from David Abel - he was the controller at the time. [p. 21]

The purpose of the ER physician expense  reclassification is to create the proper cost-to-charge ratio for each department or per diem amount for the inpatient care based on patient days and put all costs in the proper department. When done accurately it will probably maximize reimbursement. [p. 29]

Petro 867 is a time study. The purpose of the time study was to reclassify the ER physician salary to a different department on the cost report. [p. 35]

Petro stated that he was satisfied that the time study was the basis for reclassification. [p. 41]

Petro requested copies of the contract regarding the Wellness Project to see how the hospital was treating the expense and to see if it was approved.  Petro stated that the hospital was expending the Kings Bridge equipment as an operating lease on its books and records. [p. 46-47]

Regarding the Stepping Stones contract, Petro stated that the contract fee, the medical director, and any other expenses related to the IOP were classified in that department.  He also

said that the hospital would not have to have time studies for the medical director. [p. 50-56]

Concerning transported patients, he was told it was for inpatients to have tests at other places.  He says if someone in the hospital puts a patient in a car and takes him somewhere to get a CT scan or blood test that couldn't be done at the current hospital and the hospital paid this employee for mileage, that would be an allowable Medicare cost that is a reimbursable cost for a Medicare Critical Access hospital for transportation of these patients.  [p. 83-85]

### Summary of Ben Griffith Deposition, March 16, 2017, EXHIBIT H

Plaintiff specifically alleged violation of the public purchase laws and the competitive bidding requirements. [p. 15] The Hospital as owner has the obligation to determine if the project has to be put out to bid.  The owner is going to ultimately have to, through its own counsel, make that determination. [p. 19]  Griffith reviewed Minutes from the Hospital Board meetings in August, 2011 and September, 2012 that describe what generally was intended to be done to refurbish 12 rooms. The PRCH attorney, Joe Stevens, stated that a question had been raised about competitive bidding requirements for that remodeling, and in Stevens' opinion, the separate contract was in compliance with the State public purchase laws, and there was no violation of the competitive bidding requirements.  Griffith did not see any basis for concluding that bid splitting occurred. Instead, this was a legitimate justified phase of a project, all the way up to the twelve rooms. A governmental body is going to be allowed to deal with a multiphase project. [p. 26-29] There is no basis to say this was a single contract or single project, and that obliterates the whole concept of there being bid splitting in violation of public purchase law. [p. 39]

The Amended Complaint, Count V, Paragraph 114 states ""Wade Walters, Hope

Thomley, Mike Boleware and PierCon acted together in order to cause the Board to evade the public bidding law requirements." Griffith did not see any evidence of that. [p. 50-51]

Paragraph 115 of that same Count states, quote, "On information and belief, on the advice of Wade Walters and Hope Thomley, PierCon separated its invoices related to hospital renovations so that each invoice would reflect a number less than $5,000. Hope Thomley and Wade Walters presented to the Board that this was permissible under the bid law when, in fact, it was not." It is Griffith's opinion that Hope Thomley and Wade Walters did not so act or so violate the Mississippi State bid laws. [p. 51]

Griffith did not see any evidence that there was on the part of the Hospital Board, Wade Walters, PierCon, Dennis Pierce, Hope Thomley, or Wade Walters any deliberate intent to violate the state bid laws by having a single contract that was split into separate ones. [p. 52-53]

Paragraph 117 says, "Likewise, Wellness, PierCon, and ProjX agreements related to the Wellness renovations were not bid as required by Mississippi law." In Griffith's opinion, this is not true. [p. 53]

### Summary of Greg Britt Deposition, January 31, 2017, EXHIBIT I

Britt's impressions/opinions were incorporated into the documents of Exhibit 815. His opinions remain the same. Other experts are now in agreement with his comments. Britt does not believe there was any wrongdoing by PAR or Wade Walters or Performance Capital Leasing in connection with this matter. Medicare found nothing improper. Based on all the things Britt has seen and disclosed, Britt's opinion is that neither Walters nor PAR nor Performance Capital Leasing caused any damage to PRCH in connection with the work they did. [p. 242-245]

The PAR contract is consistent with what Britt is accustomed to seeing under similar

circumstances (in terms and price). Britt opines that PRCH needed someone to help them, because they weren't meeting payrolls, were not able to function. [p. 251-252]

The Cost Report requires attestation of the cost report signer. The signer must disclose if there is a "related party" as that term is defined. Britt did not see any related party transactions in the Cost Report, nor was there any evidence that there was any related parties among Walters, PAR, or Performance Capital. [p. 255]

The fact that PAR and Performance were terminated and not paid almost $1 million in services rendered further evidences the opinion that they weren't controlling the Board and administration. The fact they weren't being paid would be a strong indicator that someone wasn't in control, and if you're in control, then you're not going to fire yourself. [p. 255-256]

In the amended complaint, the hospital alleged that "Wade Walters, through his companies and agent, had taken over all financial operations and were causing the hospital to take such actions as to inappropriately and illegally increase the hospital net revenue to benefit PAR and the agents and employees of that company and others." Britt does not see any evidence of that. Britt opines that total control means you can write checks, control bank accounts, are authorized to spend money. It is Britt's understanding that Walters and PAR didn't have any of that. Britt agrees that Walters and PAR only controlled the revenue cycle, billing and collections, and that they didn't control the cash themselves, or the balance sheet, or transaction reporting on the accounting transactions. [p. 256-257]

Britt agrees Walters and PAR didn't get any of the income or net revenues from the nursing home, but states that Walters was helping the operation of the nursing home because the idea of rounding and providing services to nursing home patients is pretty much fundamental to

that business in Mississippi, and it's done everywhere else.  Walters helped them focus better on that opportunity and PRCH, as well as the nursing home, gained a significant benefit from it. [p. 258-259]

Britt confirms that one of his opinions in his report stated, "From Medicare's point of view, fraud only occurs if there is a deliberate intent to defraud.  The cost reports, in this case, contained only technical errors, which are not only common, but routinely resolved through the Medicare settlement process.  No evidence of intent to defraud appears in these reports."  He still stands by that opinion.  [p. 259-260]