UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**UNITED STATES OF AMERICA, EX REL.**
**MITCHELL D. MONSOUR AND WALTON**
**STEPHEN VAUGHAN**                                                                                          **PLAINTIFFS**

**V.**                                                        **CIVIL ACTION NO. 1:16-CV-38-HSO-BWR**

**PERFORMANCE ACCOUNTS RECEIVABLE,**
**LLC; PERFORMANCE CAPITAL LEASING, LLC;**
**WADE WALTERS; BILLY NERREN MARLOW, JR.,**
**WAYNE WALTERS; CAH MANAGEMENT –**
**FRANKLIN SERVICES, LLC; REVENUE CYCLE**
**MANAGEMENT - FRANKLIN, LLC;**
**WATKINS WARD & STAFFORD, PLLC; DONALD J.**
**(JIM) BLACKWOOD II; and SUNFLOWER**
**MANAGEMENT HOLDING COMPANY, LLC**                             **DEFENDANTS**

## WATKINS WARD & STAFFORD, PLLC'S REBUTTAL MEMORANDUM IN SUPPORT OF MOTION TO DISMISS CLAIMS ASSERTED IN SECOND AMENDED COMPLAINT

**1. RELATORS' "PRESUMED-TRUE FACTS"**

The Relators' response sets out a listing of allegations in the Second Amended Complaint that are purported to satisfy the requirements for pleading a plausible False Claims Act claim against WW&S. Those specifically addressing the alleged conduct of WW&S include the allegation that each cost report asked if there was any "related organization" with which the hospital had contracted.[1] The Relators assert that WW&S must have known that the management

---

[1] Response at 5-6. The actual question is:

> Is the provider involved in business transactions, including management contracts, with individuals or entities . . . that are related to the provider or its officers, medical staff, management personnel, or members of the board of directors through ownership, control, or family and other similar relationships?

Form CMS-2552-10, "Hospital and hospital healthcare complex reimbursement questionnaire," question no. 3; https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R3P240f.pdf, at p. 7 of the

companies run by Wade Walters and other defendants asserted significant influence over the hospitals and thus should have insisted that the question referenced by the Relators was answered "Yes," with the attendant inclusion in the cost reports of only the alleged related parties' actual costs rather than their charges to the hospitals. The Relators argue that since they alleged specific communications between Wade Walters and WW&S regarding the North Sunflower cost reports and because they allege that WW&S had possession of management contracts for Franklin County and TGH, they have adequately alleged that WW&S knew of the defendants' companies' management activities and thus knew that the answer to question 3 should have been "Yes." However, the question at issue was not whether Wade Walters or any other person or company provided management or administrative services to one or more hospitals pursuant to a contract, but whether anyone having a management contract had one of the listed relationships with the hospital and whether any management company controlled the decision to enter into contracts with other companies run by individual defendants. Thus, WW&S's alleged knowledge of Walters's and others' administrative roles does not create an inference that WW&S knew that the management companies, rather than the hospitals' boards of trustees and officers, controlled the hospitals with respect to the other contracts at issue and thus knew that the answer to the pertinent question on the cost reports was false. For the answer to be false with regard to a management contract, the defendant owning the management company must have had one of the other relationships with the hospital or its personnel listed in the question, and there is no non-conclusory allegation that there was such a relationship or that WW&S had knowledge of any such relationship. The mere fact that individual defendants' companies provided administrative

---

PDF. The Court may consider the content of form CMS-2522-10 without converting the motion to dismiss into a motion for summary judgment, because the Court may take judicial notice of the form and may consider such matters of judicial notice in connection with a Rule 12(b)(6) motion. *Great Plains Trust Co. v. Morgan Stanley,* 313 F.3d 305, 312 (5th Cir. 2002).

services that involved assisting with the preparation of cost reports and making decisions regarding day-to-day operations does not naturally suggest that they dominated the officers and trustees such that they, and not the officers and trustees, exercised control in the relevant respects. In short, as explained more fully below, the Relators have not alleged facts from which WW&S's alleged knowledge of the falsity of the "No" answer to the actual related-party question can naturally be inferred.

The Relators likewise cite the contracts of TGH and FCMH as the basis for an inference that WW&S knew that the cost reports included excessive fractional fees that were not allowable as recoverable costs. However, the Relators allege no other facts from which it can reasonably be inferred that the mere presence of fractional-fee payment provisions in the subject contracts gave WW&S knowledge that the fees were excessive and unreasonable in relation to the services provided[2] and thus were not allowable costs. With regard to North Sunflower, the Relators make no allegation that WW&S had possession of any such contracts, making not only their allegation that WW&S knew the fees were unreasonable, but also their allegation that WW&S knew what the fee structure was, utterly conclusory.

## 2. "CAUSING" FALSE CLAIMS TO BE SUBMITTED

The Relators attempt to distinguish the cases cited by WW&S as supporting its contention that merely being involved in the preparation of a cost report does not satisfy the statutory requirement for liability under the FCA of having submitted a false claim or having "caused" such a claim to be submitted, arguing that those cases are inapposite because they did not involve an accountant's preparation of a cost report for the client to submit. However, the

---

[2] There is no allegation of facts from which it could reasonably be inferred that WW&S knew what specific services were actually provided by the contractors in return for the fractional fees (which services the Relators apparently allege were less than those provided for in the contracts, see, e.g., SAC ¶¶ 47, 70) and that WW&S thus could have evaluated the propriety of the fees paid in relation to the services performed, even assuming that WW&S had the capacity to make such an evaluation, which also is not sufficiently alleged.

3

principles set out in those cases regarding FCA "causation" and pleading requirements are applicable to this case regardless of the different situations involved in those cases. For example, in *United States ex rel. Grynberg v. Ernst & Young LLP*, 323 F. Supp. 2d 1152, 1155 (D. Wyo. 2004), the plaintiff alleged, as the Relators do here, that the accountants knew or should have known of information in their clients' records that was inconsistent with information that the clients submitted to the government and that the accountants therefore violated the FCA by facilitating the clients' submission and collection of false claims. The fact that in *Grynberg* the accountants "facilitated" the false claims by failing to use the true information in preparing financial audits rather than in filling out cost reports is not a material difference and does not sufficiently distinguish that case from this one. The principle of that case that is apposite here in that an accounting firm or other person does not "cause" the submission of a false report by its client merely by knowing of the falsity of the claim and doing nothing to stop its submission. *Id*. at 1155; *citing U.S. ex rel. Piacentile v. Wolk*, No. 93-5773, 1995 WL 20833, at *4 (E.D. Pa. Jan. 17, 1995); *see also United States v. Anesthesia Servs. Assocs., PLLC*, No. 3:16-CV-0549, 2019 WL 7372511, at *10 (M.D. Tenn. Dec. 31, 2019) (mere knowledge of fraud by another does not give rise to liability under the FCA). Thus, the case is on point even though it did not involve the preparation of Medicare cost reports. *Grynberg* pertinently noted that "[o]nly those actions . . . which have the . . . effect of causing the United States to pay out money" are actionable under the FCA. WW&S's alleged knowledge that the answer "No" regarding related-party transactions was incorrect did not cause the CAHs to submit a false claim and did not have the effect of causing the payment of money; rather, it was the hospital's knowing certification of the truth of that answer when submitting the cost report that had such effect. WW&S's preparation of a draft of the cost report with that answer did not "cause" the hospital to submit the alleged false report

4

because, even if the "no" answer was false, it was, as the Relators allege and therefore admit, known to be so by the hospital's management who directed the preparation and submission of the cost reports. In short, under *Grynberg*, WW&S did not "cause" the submission of a false claim under the allegations of the Second Amended Complaint.

*United States ex rel. Pervez v. Beth Israel Med. Ctr*., 736 F. Supp. 2d 804, 814 (S.D.N.Y. 2010), did involve the submission of cost reports (for Medicaid), but the Relators' response mischaracterizes the situation in that case as involving only the accountants' evaluation of "historical" cost reports. To the contrary, in *Pervez* the accountants *audited* the cost reports prior to their submission (unlike WW&S here, which merely served as the scrivener of cost reports) and certified their apparent correctness, and the certification was included with the submission of the cost reports by the provider. *Id*. at 807, 808.[3] Nevertheless, the complaint in that case, despite the allegation that the accountants knew that the cost reports contained false allocations of costs to reimbursable cost centers, failed to state a viable claim because, even if a person could "cause" the submission of a false claim where such person had no direct interest in having the claim paid (a proposition the court found doubtful but was not required to decide), the complaint failed to allege facts from which the accounting firm's knowledge could be inferred, particularly since the plaintiff did not identify any omitted auditing procedures required by professional standards that would have disclosed that falsity of the cost reports. *Id*. at 812-13, 814, 815 n.51. Therefore, there is no valid basis for the Relators' attempt to distinguish *Pervez*, particularly since their allegations essentially attempt to impose on WW&S a duty, in effect, to audit cost reports as the defendant in *Pervez* was engaged to do. WW&S's alleged actions as a mere

---

[3] The court noted that the pertinent regulation "mandates that '[a]ll financial and statistical reports . . . be certified by an independent licensed public accountant or an independent certified public accountant . . . .' The reports, including the certifications, then are submitted to the DoH." *Id*. at 807 (alteration and first ellipsis in original). The court further stated that "[the defendant accounting firm] audited, certified, and provided an opinion letter for each of [the] allegedly false ICRs from 1991 to 2003." *Id*. at 808.

5

scrivener of the cost reports at issue here based on information provided by the CAHs[4] is much less involved than those of the accounting firm in *Pervez*, so the conclusory allegations of culpable knowledge are, if possible, even farther away from being sufficient in this case than such allegations were in *Pervez*.

The Relators do not allege that anyone from any hospital expressly informed WW&S that there were related-organization transactions among the CAHs' claimed costs; rather, the Relators' basis for their contention that the facts they allege give rise to a reasonable inference that WW&S had culpable knowledge is that WW&S, through its separate auditing of the financial statements of the CAHs, came into possession of certain of the management contracts that, the Relators allege, gave the management companies and their principals "control" of the CAHs for purposes of the "related organization" regulations. The Relators cite provisions of the management contracts that gave the management company "such powers as are necessary to manage the Facility *on a day-to-day basis*."[5] However, the fact that the management company/administrator has authority to make decisions regarding the day-to-day operation of a hospital does not establish that the management company controlled the decisions to enter into the alleged "related organization" contracts such as those for revenue cycle management services. The Second Amended Complaint does not allege with regard to any of the CAHs that the management company had unilateral authority to cause the CAH to enter into such contracts without the approval of the board of trustees. Indeed, the contracts at issue expressly disclaim

---

[4] The Relators state that the SAC contains no allegation that the CAHs' management supplied the information to WW&S to use in drafting the cost reports and that this is a contention outside the pleadings for purposes of a motion to dismiss. However, the fact is inherent in the Relators' allegation that the inclusion of false statements or costs in the cost reports was done with the full knowledge and intent of the management and in the allegation that WW&S was an independent accounting firm engaged to assist with preparation of cost reports, which carries with it the inference and rebuttable presumption that WW&S had no information about the expenses of the CAHs other than that supplied by the CAHs themselves.
[5] Brief, p. 4 ¶ (7) (emphasis added).

any such authority, and this Court can take judicial notice of such disclaimer and consider such provisions without converting the motion to dismiss into a motion for summary judgment.

On a motion to dismiss for failure to state a claim upon which relief can be granted, a court is permitted to consider certain types of documents of which it may take judicial notice without converting the motion into one for summary judgment. To be subject to judicial notice, a matter must be one "not subject to reasonable dispute" in that it is generally known or capable of determination by resort to an unimpeachable source. Fed. R. Evid. 201(b). Rule 201(d) provides that the court "shall take judicial notice if requested by a party," so long as the court is "supplied with the necessary information" to show that the matter is subject to judicial notice.

A court may take judicial notice of, and consider on a motion to dismiss, "documents that a defendant attaches to a motion to dismiss . . . [that] are referred to in the plaintiff's complaint and are central to [its] claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000); *U. S. ex rel Graves v. ITT Educational Services, Inc.*, 284 F. Supp. 2d 487, 492 n.2 (S. D. Tex. 2003) (taking judicial notice of such documents, citing *Collins*). The management contracts referenced in the Second Amended Complaint are such documents, and WW&S has filed the contracts as a supplement to its motion to dismiss [251]. Therefore, the Court can consider all pertinent provisions of the contracts, and not just those cherry-picked by the Relators, in determining whether the contracts gave the management companies the requisite control over the CAHs with regard to the subsequent contracts for goods or services at issue so as to make such contracts "related organization" transactions as the Relators allege or, just as importantly, whether the management contracts' provisions are such that "any reasonable person" would know that the management company had such requisite control, as the Relators contend.

7

Each of the management contracts referenced in the Second Amended Complaint (¶¶ 108, 109, 115, 116) contains a provision that is the same or virtually the same as paragraph 2(a)(5) of the management contract between FCMH and Prime Care Management Group, LLC referred to in paragraph 108 of the Second Amended Complaint, which provides:

> The Management Company will not contract on behalf of the Facility for substantial expenditures and will not enter into longterm [sic] contracts involving the expenditure of substantial funds without the prior approval of the Trustees.

This provision conclusively refutes the assertion that the management contracts delegated to the management company "control" of the decision to enter into the contracts with the subject companies alleged to be "related organizations" and especially the assertion that the management contracts clearly notified WW&S and anyone else reading them that the management company had such control, since the provision clearly gives control of such decisions to the board of trustees.

With regard to North Sunflower, the Relators' response cites no such management contracts of which WW&S was allegedly aware, but instead asserts that because WW&S communicated with Wade Walters with regard to at least some of the cost reports it prepared for North Sunflower, WW&S must have known that Wade Walters asserted significant influence over the hospitals. However, particularly because Wade Walters was the owner of the management company for North Sunflower, his participation in preparing cost reports does not support an inference that he or the management company dominated and controlled the hospital's board of trustees with respect to the decision to contract with any other of Walters's companies.

The Relators cite several cases in an effort to support their position that one may "cause" a false claim to be submitted and be liable under the FCA without being an owner or officer of

8

the submitting entity. However, as explained below, those cases are inapposite and do not support the Relators' argument.

*United States ex rel. Riley v. St. Luke's Episcopal Hospital,* 355 F.3d 370 (5th Cir. 2004) is inapposite for multiple reasons. First, the court applied the old "no set of facts" standard for a motion to dismiss rather than the current *Twombly/Iqbal* "plausibility" standard, and thus is not instructive regarding the adequacy of the Relators' pleading here. *Riley*, 355 F.3d at 377. Second, the contention of the physicians in *Riley*, according to the Relators' response, is that they could not be held liable for false claims submitted by the defendant hospital for services performed by the physicians because the hospitals actually submitted the cost reports, even though the physicians provided false information about their services, knowingly participated in the plot to submit false claims, and received payment from the government for false claims. The court rejected that argument, holding that a person could "cause" the submission of a claim even though such person did not have a direct contractual relationship to the government and did not directly submit the false claim. *Id*. at 378. However, this is a far different situation from the one at bar, where WW&S merely assisted in preparing the cost reports, did not itself provide any false information to the CAHs, and is not alleged to have received any share of payments received by the CAHs from the government for the allegedly improper costs. Contrary to the Relators' suggestion, causation in *Riley* was not based on mere "assistance" in preparing the cost reports, but on the physicians' active and material assistance and participation in the scheme to file false claims by their submission of false information about their services.

The holding in *Riley* is merely an example of the court's observation in *Grynberg* that the "causes to be presented" provision in the FCA reaches "persons or firms that do not deal directly with the government, but receive a financial benefit indirectly from the government by

9

motivating an intermediary to file a false claim." *Grynberg*, 323 F. Supp. 2d at 1155. The court in *Grynberg* noted the prototypical example of a subcontractor who submits a false invoice for its work to a prime government contractor knowing that the prime contractor will include that cost in its claim to the government and use the funds received from the government to pay the subcontractor's invoice or reimburse itself for such payment. Because the subcontractor in that situation is the "moving force" behind the false claim, it "causes" the submission of a false claim even though it did not submit a claim directly to the government. *Id*. Thus, *Riley* stands only for the unremarkable proposition that a person who furnishes false information to the entity that submits a claim to the government in order to obtain a payment from the entity from funds obtained thereby and is thus the moving force behind the false claim can be held liable for "causing" the presentment of the claim. *Riley* does not reach the instant case because there is no allegation that WW&S was the source of and supplied the allegedly false information to the CAHs, that WW&S sought to receive indirect payment from the government from the submission of the cost reports, or that WW&S was the moving force behind the hospitals' submission of the cost report entries at issue.

Similarly, in *United States v. Bornstein*, 423 U.S. 303 (1976), the subcontractor, even though it did not submit the false claims to the government, was held to have caused the false submissions because the subcontractor knowingly and intentionally mislabeled non-conforming electron tubes for radio kits as conforming, causing the contractor to submit claims and be paid for non-conforming kits. Thus, *Bornstein*, like *Riley*, is inapposite and does not support the Relators' position.

The Relators' reliance on *Aldridge v. Corporate Management, Inc.* is likewise misplaced. The defendant in *Aldridge* referred to in the response—defendant Kuluz— was not an accountant

10

or other third-party cost-report drafter but was involved in the management of the hospital and was at the heart of the scheme to submit false claims as the person in charge of submitting cost reports (attesting to their truth), determining the information to be reported therein, and coordinating with the cost-report preparers (who were not sued). *Aldridge v. Corporate Management, Inc.* No. 1:16-CV-369 HTW-LGI, 2021 WL 2518221, (S. D. Miss. June 18, 2021). The Relators acknowledge that Mr. Kuluz "directed" the content of the cost report; in contrast, under the allegations of the Second Amended Complaint, Wade Walters and his analogs with the other management companies, not WW&S, was the moving force behind the submission of the alleged false claims, and WW&S did not direct, but instead received direction from the CAHs' management, as to what information would be put in the cost reports. For these reasons, the *Aldridge* defendant clearly is much more analogous to Wade Walters than to WW&S (with which Mr. Kuluz has in common only that neither was the owner or an officer of the hospital in question). Thus, the case gives no support for potential liability of one such as WW&S who assists in the preparation of a cost report based on information provided by the hospital.

Similarly, the referenced defendant in *United States v. Borseau*, 531 F.3d 1159 (9th Cir. 2008) was in control of the hospital that submitted the cost reports at issue. Although the Relators describe this defendant as a "management consultant" who was not an owner or officer of the subject hospital, that description is quite misleading. In fact, both individual defendants in *Borseau* were de facto owners and operators of the hospital, the facility was owned by a limited partnership of which two corporations were the only general partners, and each individual defendant controlled and was the president and sole full-time employee of one of the general-partner corporations. The opinion makes clear that together the two individual defendants ran the hospital. *Id*. at 1162-63. In addition, the referenced defendant's actions in "personally causing"

11

the hospital's cost report to include non-reimbursable costs consisted of ordering the third-party cost-report preparers to include the improper costs in the cost reports over their objection and advice that the costs were not reimbursable under Medicare law and regulations.[6] *Id*. at 1163. The role of the referenced defendant in *Borseau* thus is in no way comparable to that of WW&S here; therefore, the case does not support the Relators' argument.

The Relators describe the criminal defendant in *United States v. White*, 492 F.3d 380 (6th Cir. 2007), as the owner of a consulting company that prepared the cost reports for the subject psychiatric center ("Pathways"), in an apparent effort to equate his role with that of WW&S here. However, White's role as a preparer was in no way comparable to that of WW&S under the allegations of the Second Amended Complaint because White, through his company, "essentially operated and controlled the center." Thus, White and his company, as the operator of Pathways, controlled the content of the cost reports they prepared, unlike WW&S, which, the Second Amended Complaint acknowledges, relied on information provided by, and decisions made by, the hospitals' representatives for the content of the cost reports it prepared. Consequently, *White* is inapposite.

The Relators assert that the cases they cite demonstrate that "persons whose conduct ends up determining any dollar amount or other item or representation included within any Medicare cost report can indeed have liability" under the FCA. Even if that proposition were true without qualification, it would not be a basis for holding WW&S liable. It was not WW&S's conduct that "determined" that the answer to the related-party-transaction question would be "No"; rather, it was the conduct of the management personnel who admittedly knew that the "No" answer was false (if indeed it was false) and thus were not caused by WW&S to include the false statement

---

[6] The cost-report preparers in *Borseau* were not named as defendants despite their knowing inclusion of improper cost in the cost reports they prepared, perhaps due to a recognition that it was the individual defendants, and *not* the preparers, who could plausibly be said to have "caused" the false claims.

in the cost reports but knowingly and willingly included the answer in the particular cost reports they submitted.

Contrary to the Relators' assertion, WW&S has not made the broad contention that a cost report preparer cannot be liable under the FCA regardless of its conduct. That proposition is not at issue for purposes of the instant motion. What WW&S contends is that the mere technical drafter of the cost report cannot "cause" the submission of a false claim under the circumstances alleged by the Relators—where the administrators of the CAHs, who retained the preparer to serve as scrivener of the cost report based on information supplied by the administrators, had full knowledge of the falsity of the statements made and claims submitted and were the originators and moving force of a plan to submit false claims. The Relators, who have the burden of proof, have not cited any case in which an independent cost report preparer was held to have caused the submission of a false claim under circumstances even remotely similar to the circumstances alleged in the Second Amended Complaint.

3. MATERIALITY

The Relators argue that the allegations against WW&S in the Second Amended Complaint meet the pleading standard with respect to the element of materiality because they allege that Medicare payment contractors rely on statements in the cost reports in determining the reimbursement to be paid to the submitting hospital. However, that argument does not adequately plead materiality *with respect to WW&S*. Under the allegations of the Second Amended Complaint, the information in the cost reports was not provided or attested to by WW&S but was provided to the government by the hospitals through their representatives, and the cost reports are submitted by and attested to by the hospitals and thus are the statements of

the hospitals and not those of WW&S. The Second Amended Complaint fails to allege any statement made by WW&S that was material to the intermediary's payment decisions.

As shown in WW&S's initial brief, knowledge is an essential element of the materiality analysis. *See Universal Health Servs. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). Therefore, the Relators must allege and prove WW&S's culpable knowledge in order to prove the materiality element of the claim. As shown above and in the initial brief, the Second Amended Complaint does not adequately allege such knowledge[7].

Moreover, there is no allegation that the government relied on the fact that WW&S did the accounting work in the preparation of the cost reports, on the assumption that WW&S vouched for the correctness of the information therein, or on the assumption that certain necessary accounting procedures or standards were followed that bolstered the reliability of any particular items in the reports when in reality such procedures or standards were not followed. Consequently, the Relators do not plausibly allege that WW&S's alleged wrongful action in inserting the "No" answers to the related-party-transaction questions on the drafts of the cost reports it prepared—rather than the hospitals' submission of the reports and attestation of their correctness—was what was relied upon by the intermediary in making payment decisions. Moreover, WW&S's alleged actions in including false information in the draft of the cost report could not be material where, as the Relators allege, every false statement or failure to disclose in the cost report was known to, consented to, and attested to by CAH management personnel. Therefore, the Relators have failed to satisfy the pleading requirements regarding the materiality of any statement or action of WW&S.

---

[7] As the Court noted in *Escobar*, courts should apply its materiality standard to dismiss actions, when, as here, they fail to plead fraud with plausibility or particularity. *See* 136 S. Ct. at 2004, n. 6.

4. FRAUD

The Relators suggest that this Court's prior ruling on other defendants' motions premised on Rule 9(b) controls WW&S's analogous motion. However, the fact that the Relators adequately pleaded fraud with respect to other defendants is not dispositive since the issue here does not turn on what the Relators alleged as to the other defendants' conduct, but whether they have adequately alleged fraudulent conduct by WW&S. Thus, the Relators' particularized allegations of fraud on the part of other defendants does not suffice to state a viable claim against WW&S; to do that, the Relators must "state with particularity the circumstances constituting fraud" by WW&S.

There are no allegations in the Second Amended Complaint of any fraudulent statement made by WW&S personnel to anyone. The mere assistance in the preparation of a cost report that is false or fraudulent based on information received from the entity that submitted the report is not a "circumstance constituting fraud." WW&S's technical services in populating a report with data it receives could not constitute fraud on its part unless WW&S knew that the contents of the report were false. *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009) (elements of FCA claim include "that the claim was false or fraudulent and that the action was undertaken knowingly"); *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (fraud requires that false statement be "made with the intent to defraud"). Therefore, the Relators have the burden to plead the existence of particular circumstances showing that WW&S had such knowledge of falsity. As set forth above, they rely only on the allegations regarding communications with Wade Walters, and on WW&S's possession of management contracts, which are not sufficient to support an inference of culpable knowledge. And since the *Twombly* requirements apply to the Rule 9(b) standard, *Grubbs*, 565 F.3d at 185, a plaintiff

15

cannot satisfy Rule 9(b)'s particularity requirement by pleading facts that are merely *consistent* with fraudulent intent. As explained in WW&S's principal brief, the Relators' allegations of facts purportedly evidencing fraud on the part of WW&S are, at best, merely consistent with culpable knowledge and thus do not support a valid inference that WW&S had knowledge that the statements at issue were false. *See also U.S. ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 Fed. Appx. 892, 897 (5th Cir. 2020) (concluding that a "claim is merely conceivable and not plausible," and hence should be dismissed, "if the facts pleaded are consistent with both the claimed misconduct and a legal and obvious alternative explanation") (internal quotation and footnote omitted).

In addition, pleading fraud with sufficient particularity requires that the plaintiff allege not only the particulars of the false representation and the identity of the person making the representation but also "what that person obtained thereby." *Grubbs*, 565 F.3d at 186. The Second Amended Complaint utterly fails to allege what WW&S obtained by any purportedly fraudulent statement it allegedly made. The Relators fail to allege that WW&S got anything out of the preparation of the cost reports other than a fee for its services commensurate with what it charged other clients for similar services or that WW&S received more compensation for preparing the cost reports at issue than it would have received if the cost reports did not contain false information as alleged. There is no allegation that WW&S received any share of the CAHs' alleged ill-gotten gain. For these reasons, the Relators' allegation of fraud on the part of WW&S fails to satisfy the pleading standard.

**5. CONSPIRACY**

The Relators rely on *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009) for the contention that the Second Amended Complaint sufficiently pleads that WW&S

was a participant in a conspiracy to submit false claims, summarizing the holding of that case as that a conspiracy may viably be pled "through logical inferences from alleged communications between the agreeing parties." However, *Grubbs* does not support the Relators' argument. In that case, the court held that the plaintiff failed to sufficiently plead conspiracy with regard to a majority of the defendants. The court found that the plaintiff had sufficiently plead conspiracy as to only two of the defendants, and that was because the plaintiff alleged that the two had met with him and explained to him how they submitted false billings for patient encounters that never occurred. The court held that this was a sufficient allegation of conspiracy because the complaint "attributes specific language to [the defendants] . . . which indicates . . . that they were in agreement between themselves and some members of the nursing staff to improperly record unprovided services." *Id*. at 193-94. The Relators cite no allegation of a similar conversation here. As to the other defendants in *Grubbs*, the court held that the allegations that those defendants submitted false claims and that they conspired to do so was not sufficient to withstand a motion to dismiss. *Id*. at 194.

*Grubbs* thus holds the Relators to the burden of alleging specific communications between WW&S and other alleged conspirators that give rise to a logical inference of an agreement by WW&S to participate in the alleged unlawful scheme. By that standard endorsed by the Relators, the allegations they cite as sufficiently pleading a conspiracy involving WW&S patently fall woefully short of sufficiency. For example, paragraph 58 of the Second Amended Complaint merely alleges generally an agreement among the defendants with respect to inclusion of fractional fee payments in cost reports. The other paragraphs cited on page 21 of the response brief, to the extent they allege "agreement" at all, consist of similar general and conclusory allegations of agreement among the defendants. The Relators allege no particulars of any

17

conversation or other communication between WW&S and any other defendant that would suggest that WW&S's alleged "agreement" as to including such costs in any cost report was an agreement knowingly to include an impermissible cost rather than merely a reasonable and good-faith acceptance of a cost figure supplied by the client as is typical for the preparation of financial documents by accountants. These allegations fall far short of that deemed sufficient in *Grubbs*: the allegation of "specific language . . . which indicates that they were in agreement . . . to improperly record unprovided services for the purpose of getting fraudulent claims paid by the Government." As noted, similar allegations in *Grubbs* were held to be insufficient.

*Grubbs* makes clear that it is not enough simply to allege the existence of an agreement; instead, the plaintiff must make specific allegations from which a conspiracy may be "naturally inferred," and the allegations must "do more than point to a possibility" of a conspiracy. *Id*. at 194. The conclusory allegations cited in the response do not meet that standard.

The Relators also rely on *United States v. Herlihy*, 157 F.3d 900 (5th Cir., 1998). However, that case is completely inapposite. It did not involve an FCA civil suit or any other type of civil conspiracy claim, but rather was an appeal from a criminal conviction for mail fraud and violation of the FCA, and the holding cited by the Relators involved an interpretation of the federal sentencing guidelines, not the FCA. The court's holding referred to by the Relators is that the defendant physician's sentencing level could be based on losses from fraudulent claims to insurance companies and CHAMPUS in which he or his services were not directly involved because the sentencing guidelines allow a defendant to be held accountable for "all reasonably foreseeable acts and omissions of others in furtherance of [a] jointly undertaken criminal activity." Also, the court's opinion says nothing about the physician having "implicitly" joined the scheme; rather, the opinion makes clear that the evidence showed that physician knowingly

18

and willingly participated in the scheme to submit false claims from the clinic of which he was an employee (and later the owner) and that he cooperated in submitting the claims as to which he was not the treating physician. That the sentencing guidelines allowed the losses resulting from the latter claims to be considered in determining the sentencing level has no relevance whatsoever to whether the Relators here have adequately alleged WW&S's participation in a conspiracy.

## CONCLUSION

For the reasons stated herein and in WW&S's principal brief, the Relators have failed to allege facts from which valid inferences can be drawn that take the case beyond the default conclusion—that WW&S innocently prepared the cost reports at issue in good-faith reliance on information given to it by the CAHs—to the level of a plausible claim that WW&S was a knowing and willing participant in a conspiracy to submit false claims, knowingly made false or fraudulent statements, or knowingly "caused" false claims to be submitted. The alleged false answer to the "related party" question on the cost reports was not, as the Relators assert in conclusory fashion, the answer of WW&S, but rather the answer of the particular CAH, and the Relators have failed to allege any facts supporting an inference that WW&S "caused" the CAHs falsely to give such answer. Similarly, there are no sufficient allegations that WW&S "caused" the CAHs to report unallowable costs for services provided by the defendant companies for "fractional fees." Accordingly, the Second Amended Complaint fails to satisfy the requirements for pleading a claim upon which relief may be granted, and the Court should grant WW&S's motion to dismiss.

RESPECTFULLY SUBMITTED,

WATKINS, WARD & STAFFORD,
PLLC, Defendant

By:   */s/ John G. Wheeler*
John G. Wheeler
Mississippi Bar No. 8622
jwheeler@mitchellmcnutt.com

Michael Chase
Mississippi Bar No. 5969
mchase@mitchellmcnutt.com

OF COUNSEL:

MITCHELL, MCNUTT & SAMS, P.A.
105 SOUTH FRONT STREET
POST OFFICE BOX 7120
TUPELO, MISSISSIPPI 38802-7120
Telephone: 662-842-3871
Facsimile:  662-842-8450

### CERTIFICATE OF SERVICE

I, John G. Wheeler, attorney for defendant Watkins, Ward & Stafford, PLLC, hereby certify that I have this day electronically filed the above and foregoing **WATKINS WARD & STAFFORD, PLLC's REBUTTAL MEMORANDUM IN SUPPORT OF MOTION TO DISMISS CLAIMS ASSERTED IN SECOND AMENDED COMPLAINT** with the Clerk of the Court using the ECF system which sent notification of such filing to counsel who have electronically registered with the Court.

This, the 9th day of September, 2022.

*/s/ John G. Wheeler*
JOHN G. WHEELER
