## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

UNITED STATES *ex rel.*                    **RELATORS**
MITCHELL D. MONSOUR and
WALTON STEPHEN VAUGHAN


v.                                **Civil No. 1:16-cv-00038-HSO-BWR**


PERFORMANCE ACCOUNTS
RECEIVABLE, LLC, et al.                 **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT WATKINS WARD & STAFFORD, PLLC'S MOTION [239] TO DISMISS

BEFORE THE COURT is Defendant Watkins Ward & Stafford PLLC's Motion [239] to Dismiss. The Motion [239] is fully briefed. Based upon its review of the record and relevant legal authority, the Court finds that Defendant's Motion [239] should be granted, and that Relators' claims against Defendant Watkins Ward & Stafford PLLC should be dismissed with prejudice.

## I. BACKGROUND

A.    Background facts

In 2016, Mitchell D. Monsour and Walton Stephen Vaughan ("Relators"), acting as Relators on behalf of the United States, filed a Complaint [3] in this Court under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. Relators have since amended their Complaint twice. The Second Amended Complaint [228], the current operative pleading, names as Defendants Performance Accounts Receivable, LLC, Performance Capital Leasing, LLC, Wade Walters, Billy Nerren Marlow, Jr., Wayne

Walters, CAH Management – Franklin Services, LLC, Revenue Cycle Management – Franklin, LLC, Donald J. Blackwood II, Sunflower Management Holding Company LLC, and Watkins Ward & Stafford PLLC (collectively "Defendants"). 2d Am. Compl. [228] at 3-5. Relators allege that Defendants violated the FCA by submitting Medicare cost reports that included unallowable costs. *See generally id.*

Relators' claims arise from Medicare cost reports filed by three Critical Access Hospitals ("CAHs") starting in 2010. Medicare reimbursement for CAHs differs from traditional hospitals: while reimbursement for traditional hospitals is capped for any particular service, Medicare reimburses CAHs for 101 percent of their reasonable and allowable costs. *See* 42 U.S.C. § 1395f; 42 C.F.R. § 413.70. As a result, CAHs are incentivized to maximize the amount of costs claimed on their cost reports because the more money they claim, the more they receive from Medicare. *See United States ex rel. Aldridge v. Cain*, 1:16-cv-369-HTW-LRA, 2018 WL 1162252, at *3 n.11 (S.D. Miss. Mar. 4, 2018).

Medicare guidelines place limits on what costs are allowable. Two provisions are relevant to Relators' claims here. 2d Am. Compl. [228] at 11-14. First, "[a]ll payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries." 42 C.F.R. § 413.9(a). Costs "not related to patient care" are not allowable. 42 C.F.R. § 413.9(c)(3). Second, costs derived from services, facilities, and supplies from a "related organization" are only allowable "at the cost to the related organization" so long as it does "not exceed the price of comparable services, facilities, or supplies

that could be purchased elsewhere." 42 C.F.R. § 413.17(a); *United States ex rel.*

*Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 172 n.5 (5th Cir.

2004). An organization is "related" when "the provider to a significant extent is

associated or affiliated with or has control of or is controlled by the organization

furnishing the services, facilities, or supplies," either through common ownership or

control. 42 C.F.R. § 413.17(b). Common ownership requires that an individual

possesses "significant ownership or equity in the provider and the institution or

organization serving the provider." 42 C.F.R. § 413.17(b)(2). "Control exists if an

individual or an organization has the power, directly or indirectly, significantly to

influence or direct the action or policies of an organization or institution." 42 C.F.R.

§ 413.17(b)(3).

To verify compliance, Medicare cost reports require providers to disclose

whether any services were provided by a related organization and, if so, the cost of

those services so that Medicare can determine whether those costs "reflect the costs

to the related party, whether the costs are within the price of comparable services

that may be purchased elsewhere, and whether the provider acted as a prudent

buyer." *United States v. Bourseau*, No. 3-CV-907-BEN(WMC), 2006 WL 2961105, at

*10 (S.D. Cal. Sept. 29, 2006) (citing 42 C.F.R. § 413.17(a); *CMS Provider*

*Reimbursement Manual 1* § 2135.3(A)), *judgment amended on other grounds by*

2006 WL 3949169 (S.D. Cal. Dec. 1, 2006).

B.    The alleged fraud

Relators assert that Defendants Wade Walters, Billy Marlow ("Marlow"), Wayne Walters, and Donald J. Blackwood II ("Blackwood") owned and operated various management companies that claimed to help CAHs maximize their Medicare cost reimbursement. 2d Am. Compl. [228] at 14-43. Under the alleged scheme, these management companies contracted with three CAHs (North Sunflower Medical Center ("NSMC"), Tallahatchie General Hospital ("TGH"), and Franklin County Memorial Hospital ("FCMH")) to provide this service, where the management company would select an administrator who would manage day-to-day tasks for the hospital and advise the hospital regarding its provision of patient services in exchange for a percentage of the hospital's total collections. *Id.* According to Relators, these contracts gave Wade Walters, Marlow, Wayne Walters, and Blackwood significant control over the relevant CAHs such that they qualified as related parties under 42 C.F.R. § 413.17, and consequently, the payments from the CAHs to the management companies constituted related-organization costs. *Id.* Relators allege that Medicare cost reports from the three CAHs included the costs paid to the management companies for the provision of their services, and that the inclusion of those costs violated the FCA because the costs were not related to providing patient services and were paid to related organizations in excess of the cost to the related organizations themselves. *Id.* at 18-25; 29-33; 35-43.

Defendant Watkins Ward & Stafford PLLC ("WWS") is an accounting firm that, according to Relators, "prepared and authored, and submitted to the

4

Administrator of each [CAH] to sign and submit to Medicare," the cost reports for the three hospitals for each of the relevant years, 2010 through 2020. *Id.* at 43. Relators assert that WWS violated 31 U.S.C. § 3729(a)(1)(A)-(C) by knowingly causing a false claim to be presented, knowingly making a false statement material to a false claim, and conspiring to present a false claim and to make a false statement material to a false claim. *Id.* at 55-59.

Relators base their allegations against WWS on it answering "no" to a question on the Medicare cost reports, which asked whether there were any related organization costs, and telling the administrators of the hospitals that the cost reports were "suitable" for submission to Medicare. *Id.* at 41-43, 46, 49. Relators claim that WWS conspired with the other Defendants to submit the cost reports containing fraudulent claims and that WWS knew these costs were not allowable based on (1) copies of the contracts between the management companies and two of the CAHs[1] and (2) WWS's communications with the other Defendants. *Id.* According to Relators, the contracts reflected that the CAHs' Boards of Trustees shifted powers to the management companies

> as are necessary to manage the Facility on a day-to-day basis including, but not limited to, the authority and power "to purchase property and services" in the Administrator's discretion, the power to "employ, discipline and discharge employees" in the Administrator's discretion ("and prescribe the duties of employees"), and the power to "perform all such other acts and have such additional powers as may be necessary for the efficient operation of the Facility on a day-to-day basis."

---

[1] The Second Amended Complaint [228] alleges that WWS possessed copies of contracts between the management companies and FCMH and TGH, but does not allege that WWS had a copy of any contract between NSMC and a management company. *See* 2d Am. Compl. [228] at 44, 47, 50-52.

*Id.* at 44, 47. Relators maintain that the delegation of authority in the contracts made WWS aware that the management companies were related organizations, and thus that WWS knowingly authored false answers in the cost reports. *Id.* at 41-43, 46, 49.

C.   WWS's Motion [239] to Dismiss

WWS has filed the present Motion [239] to Dismiss, arguing that Relators have failed to properly allege any of the four elements of an FCA claim against it. Mem. [240] at 3-4. WWS further contends that Relators have not alleged sufficient facts to show an agreement between it and the other Defendants to support an FCA conspiracy claim, and that the Second Amended Complaint [228] does not satisfy the requirements for pleading fraud under Federal Rule of Civil Procedure 9(b). *Id.* at 4.

Relators respond that their Second Amended Complaint [228] plausibly pleads FCA liability for WWS. *See generally* Mem. [246]. They contend that by authoring the cost reports that "it knew [were] going to be submitted to Medicare," WWS's actions determined the amount paid by Medicare, thereby causing a false claim to be presented in violation of 31 U.S.C. § 3729(a)(1)(A), and causing a false statement to be made that is material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B). *Id.* at 10-14; 2d Am. Compl. [228] at 56-57. Relators further state that inaccurate disclosures about a cost influences Medicare's reimbursement decisions such that cost reports are material to payment of claims. Mem. [246] at 14-16; 2d. Am. Compl. [228] at 10-11. Regarding WWS's knowledge, Relators argue that they

have satisfied pleading requirements by alleging generally that WWS knew of the fraud through the contracts it received. *Id.* at 4-9, 19-20 & n.5. Finally, Relators assert that the Second Amended Complaint [228] sufficiently pleads a conspiracy because WWS "agreed with the subject rural hospitals to prepare and recommend cost reports it knew would be submitted to Medicare" and authored cost reports that included impermissible costs while telling the hospitals that such reports were suitable to be submitted. *Id.* at 20-21.

In reply, WWS disputes Relators' characterization of the contracts between the CAHs and the management companies it had in its possession. Reply [252] at 1, 6-8. To support this argument, WWS filed a Supplement [251] to its Motion to Dismiss,[2] attaching copies of the contracts it received in preparing its cost reports for TGH and FMCH. Ex. [251-1]; [251-2]; [251-3]; [251-4]. WWS points to a provision prohibiting the management companies from contracting on behalf of the CAHs for substantial expenditures without the approval of the Boards of Trustees for the CAHs as proof that the contracts were insufficient to inform WWS that the management companies were related organizations. Reply [252] at 8. WWS further contends that its "preparation of a draft of the cost report . . . did not 'cause' the hospital to submit the alleged false report because, even if the 'no' answer was false,

---

[2] This Supplement [251] is styled on the docket as a "Supplemental Motion to Dismiss." In substance, however, it merely requests that the Court take judicial notice of the contracts to which Relators refer in the Second Amended Complaint [228]. *See* Supp. [251]. The Court therefore construes this docket entry as exhibits to WWS's Motion [239] and Reply [252], rather than as an independent motion. But to the extent it appears on the docket as an independent motion to dismiss, the Court will deny it as moot in light of its decision to grant WWS's Motion [239].

it was . . . known to be so by the hospital's management who directed the preparation and submission of the cost reports." *Id.* at 4-5.

## II. DISCUSSION

A.   Relevant legal authority

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," and the facts alleged must be more than "merely consistent with a defendant's liability." *Id.* (quotation omitted). A court must accept all well-pleaded facts as true, view them in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Johnson v. BOKF Nat'l Ass'n*, 15 F.4th 356, 361 (5th Cir. 2021). However, a complaint's legal conclusions are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680.

When "considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). A district court may also rely on "any documents the pleadings mention that are central to the plaintiff's claims" when a party files such documents with its motion or response. *In re GenOn Mid-Atl. Dev., L.L.C.*, 42 F.4th 523, 546 (5th Cir. 2022) (citing *Collins*, 224 F.3d at 498-99); *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019). WWS has attached as a Supplement [251] to

its Motion [239] the four contracts on which the Relators rely in part to assert that the management companies were related organizations and that WWS knew of their control over the CAHs. Because the Relators' Second Amended Complaint cites these contracts as central to its allegations against WWS, *see* 2d Am. Compl. [228] at 25-31, 37-42, 44-49; Resp. [245] at 4-8, the Court may properly consider them in resolving the Motion [239], *see Inclusive Cmtys. Project, Inc.*, 920 F.3d at 900 (holding that a district court can consider documents central to the plaintiff's claims presented by the defendant because they "merely assist[] the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated" (quoting *Collins*, 224 F.3d at 499)).

A complaint brought under the FCA must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Typically, to satisfy this requirement, a plaintiff must plead "the time, place and contents of the false representation[], as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Grubbs*, 565 F.3d at 186 (quoting *United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999), *abrogated on other grounds by United States ex rel. Eisenstein v. City of New*

*York*, 556 U.S. 928 (2009)). For an FCA claim, however, "a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

B.    False claims under § 3729(a)(1)(A)-(B)

1.    The required elements

WWS argues that Relators have not adequately pled any of the four elements of an FCA claim as against it. Mem. [240] at 3. FCA claims for causing a false claim to be presented or for making a false statement material to a false claim have the same four elements: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 653-54 (5th Cir. 2017) (quoting *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012)); *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 466-67 (5th Cir. 2009). Because the Court finds that Relators have failed to sufficiently allege the element of scienter as it pertains to WWS, it need only address that element.

The FCA imposes liability for "*knowingly* present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" or "*knowingly* mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement

material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B) (emphasis added). Consequently, to state a claim under the FCA, a plaintiff must sufficiently plead that a defendant acted knowingly in making the false claim. *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 365 (5th Cir. 2014); *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338-39 (5th Cir. 2008). To act knowingly for purposes of the FCA, a defendant must either (1) have "actual knowledge of the information"; (2) "act[] in deliberate ignorance of the truth or falsity of the information"; or (3) "act[] in reckless disregard of the truth or falsity of the information." § 3729(b)(1)(A). This scienter requirement is "rigorous," *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016), and "is not met by mere negligence or even gross negligence," *Farmer*, 523 F.3d at 339; *United States ex rel. Jacobs v. Walgreen Co.*, No. 21-20463, 2022 WL 613160, at *1 (5th Cir. Mar. 2, 2022).

WWS contends that Relators' Second Amended Complaint [228] alleges at most that it acted negligently. Mem. [240] at 13-14. It points to language from the Second Amended Complaint [228] asserting that its accountants "knew (or would and should have known if they had exercised reasonable care and complied with professional standard for preparing Medicare cost reports)" that the costs on the reports were not allowable. *Id.* at 13 (quoting 2d. Am. Compl. [228] at 51). Relators respond that the management contracts showed that the boards of TGH and FCMH had "'delegated' essentially all management powers to a management company ultimately owned" by the other Defendants, who then received fees beyond the

11

actual expense to those Defendants for providing the management services. Resp. [245] at 5-7; *see also* 2d Am. Compl. [228] at 31-32, 40-41, 44, 47-49.

Regarding NSMC, Relators claim that emails and other communications between Wade Walters and WWS show that "Wade Walters was empowered to act for and bind the North Sunflower Hospital as to its financial decisions" and that he had "*de facto* control over North Sunflower's finances." Resp. [245] at 5; 2d Am. Compl. [228] at 50. WWS counters that these contracts merely informed it that the management company "ha[d] the authority to make decisions regarding the day-to-day operation" for the CAH, not that the management company controlled the CAH. Reply [252] at 6.

2.   WWS's scienter as to NSMC

The Second Amended Complaint [228] asserts that WWS knew that NSMC's costs from the relevant management company were related-organization costs based upon emails between Wade Walters and WWS's accountants that "routinely acknowledged that [WWS] was expected to report to Wade Walters for decisions about what costs to include in the NSMC cost reports." 2d Am. Compl. [228] at 50. Relators further posit that WWS

> knew (or would and should have known if [it] had exercised reasonable care and complied with professional standards for preparing Medicare cost reports), the influence of Wade Walters over the financial and management decisions of NSMC was so substantial that Wade Walters was allowed by NSMC to cause NSMC to enter numerous non-competitive service contracts, at prices that Wade Walters selected, with companies owned exclusively by Wade Walters, including purchases of contract labor (for which NSMC paid more than $12 million to Walters-owned Delta Staffing LLC) and numerous non-competitive 'leases' of modular buildings, permanent buildings, medical equipment, and

pharmacy equipment for which NSMC paid Walters-owned Defendant
Performance Capital Leasing LLC substantial additional sums) [sic].

*Id.* at 51.

These statements do not plausibly allege or imply that WWS knew that these
costs were from related organizations. Moreover, even if WWS knew that the
management companies exercised substantial control over NSMC, Relators have
failed to plead a sufficient factual basis to show that WWS knew that the costs
themselves were unallowable.

The Second Amended Complaint's [228] general allegation that WWS "knew"
of Wade Walters's influence might be sufficient if Relators provided enough facts to
support that assertion. However, Relators generally refer only to emails, stating
that "WWS was expected to report to Wade Walters for decisions" about allowable
costs, and contracts between Wade Walters's companies and NSMC. *Id.* at 50-51.
But no information is pled as to what about the content of the emails placed WWS
on notice of Wade Walters's influence. As to WWS, these factual allegations are
insufficient to satisfy the "rigorous" scienter element, *see Escobar*, 579 U.S. at 192,
because they do not provide a sufficient basis to show how, in preparing the cost
reports, WWS would have known that Wade Walters was causing NSMC to enter
contracts or otherwise substantially controlling the hospital. Regarding the emails
and communications, WWS was hired to prepare the cost reports, 2d Am. Compl.
[228] at 43, and Wade Walters's central service to the hospital was helping it to
maximize its Medicare reimbursement, *id.* at 14-17. Communications indicating
that WWS should report to Wade Walters regarding decisions in preparing the

13

Medicare cost reports correspond with his contractual role as the hospital's hired consultant for the cost reports, and, consequently, are insufficient by themselves to imply that WWS knew he exercised significant control over the CAH.

The additional allegations that WWS should have known about Wade Walters's control based on various other contracts between NSMC and his companies fail to plausibly allege FCA knowledge on WWS's part by their very terms. The Second Amended Complaint [228] states that WWS "would and should have known if [it] had exercised reasonable care and complied with professional standards for preparing Medicare cost reports," *id.* at 51, but what WWS "should have known" through the exercise of reasonable care and professional standards speaks only to whether WWS was negligent. Knowledge under the FCA requires more than even gross negligence. *Farmer*, 523 F.3d at 339; *Walgreen Co.*, 2022 WL 613160, at *1.

Further, the Second Amended Complaint [228] does not plead sufficient facts to establish how WWS knew that these costs were not sufficiently related to patient care, or that these costs exceeded the cost to the allegedly related organization in providing the service. This is because Relators' factual allegations suggest that, in deciding what costs to include, WWS relied on Wade Walters who indicated that the costs included in the reports from NSMC were allowable. 2d Am. Compl. [228] at 24; *see also id.* at 23 (asserting that Wade Walters was "a principal decision-maker for NSMC" for "cost report matters"). Relators assert that WWS "deferred to decisions made or directed by Wade Walters in the course of preparation of each such

Medicare cost report on behalf of NSMC" and that Wade Walters "exercised significant influence and power over decisions . . . concerning which costs were included in the line items or categories of each Medicare cost report filed on behalf of NSMC." *Id.* at 24. According to Relators, Wade Walters was setting the contract prices for the costs at issue for services provided by his companies. *Id.* at 51.

Since the limits on costs allowable from related organizations are based on the cost to the related organization in providing those services and the reasonable market price, 42 C.F.R. § 413.17(a), WWS's deference to Wade Walters, the provider of those services, does not by itself support an inference that WWS knew the costs were excessive, *see* 2d Am. Compl. [228] at 24. Instead, the plausible inference from Relators' allegations is that WWS relied on the provider who claimed that the costs in the reports matched the costs to his companies in providing the services. Even if WWS was negligent in deferring to Wade Walters, such allegations are insufficient to demonstrate reckless disregard or deliberate indifference in the absence of a factual basis to infer that WWS had obvious reasons to doubt whether Wade Walters was providing accurate information. This is not sufficient to plead that WWS had the requisite scienter under the FCA. *See Farmer*, 523 F.3d at 339.

3.    WWS's scienter as to TGH and FCMH

In alleging that WWS knew of the inaccuracies in the cost reports it prepared for TGH and FCMH, Relators point to four contracts: (1) the 2012 Management and Consulting Services Agreement between Prime Management and FCMH, 2d Am. Compl. [228] at 44; (2) the 2019 Management and Consulting Services Agreement

between Franklin Management and FCMH, *id.* at 45; (3) the 2010 Management and Consulting Agreement between Sunflower CAH Management Group, LLC, and TGH, *id.* at 47; and (4) the 2013 renewal of the 2010 Management and Consulting Agreement, *id.* at 48. The contracts, submitted by WWS as Exhibits [251-1], [251-2], [251-3], and [251-4] to its Motion [239], all use "the same relevant language" regarding the powers delegated by the respective CAH to the management company. 2d Am. Compl. [228] at 45, 47-48. Accordingly, the Court finds it unnecessary to discuss each contract individually in analyzing whether WWS's possession of the contracts provided it with sufficient knowledge to state a claim under the FCA.

The contracts begin by outlining the basic responsibilities of the management company under the agreement:

> The Management Company shall provide consultation and assistance to the Trustees through the Administrator . . . for the operation and management of the Facility. To enable the Management Company to fulfill its duties and responsibilities in the management of the Facility, the Trustees specifically delegate to the Administrator such powers as are necessary to manage the Facility on a day-to-day basis including, but not limited to, the authority and power to:
>
> (1)    Purchase property and services as is necessary or appropriate for the operation of the Facility on a day-to-day basis (in compliance with all applicable state bid and purchasing laws);
>
> (2)    Employ, discipline and discharge employees as may be necessary for the efficient operation of the Facility and prescribe the duties of employees;
>
> (3)    Supervise and control the records, accounts, buildings, equipment and other property of the Facility;

(4)     Enforce compliance with the Facility's bylaws, rules, regulations, policies, procedures and compliance plan with respect to the operation of the Facility; and

(5)     Perform all such other acts and have such additional powers as may be necessary for the efficient operation of the Facility on a day-to-day basis.

The Management Company will not contract on behalf of the Facility for substantial expenditures and will not enter into long-term contracts involving the expenditure of substantial funds without the prior approval of the Trustees.

Ex. [251-1] at 1-2; *see also* Ex. [251-2] at 1-2; [251-3] at 1-2; [251-4] at 1-2.

In addition, the contracts list various areas where the management company would provide advice and guidance to the CAH's trustees and required the company to recruit physicians for the hospitals. Ex. [251-1] at 2-4; [251-2] at 2-4; [251-3] at 2-4; [251-4] at 2-4. Regarding the appointment of the administrator, the contracts specified that "[t]he Management Company shall designate an Administrator for the Facility" and the "Facility shall have input with respect to the Management Company's selection of an Administrator." Ex. [251-1] at 4; [251-2] at 5; *see also* Ex. [251-3] at 4 (naming Marlow as administrator whose selection was "approved, confirmed and ratified by the Trustees"); [251-4] at 4 (same). The CAH's trustees remained empowered to provide notice requesting the administrator be replaced "[i]f at any time the [t]rustees [were] reasonably dissatisfied with the Administrator." Ex. [251-1] at 4-5; [251-2] at 5; [251-3] at 4-5; [251-4] at 4-5. The contracts go on to describe payments from the CAH to the management company for performance of the contracts, possible grounds for termination of the agreements, and provisions related to the CAH and management company sharing records. Ex.

[251-1] at 5-10; [251-2] at 5-10; [251-3] at 5-9; [251-4] at 5-9. All contracts were signed by the relevant hospital's board of trustees. Ex. [251-1] at 14; [251-2] at 15; [251-3] at 14; [251-4] at 14. For the management companies, Wade Walters signed the 2012 agreement with FCMH, Ex. [251-1] at 14, Wayne Walters signed the 2019 agreement with FCMH, Ex. [251-2] at 15, and Marlow signed the two agreements with TGH, Ex. [251-3] at 14; [251-4] at 14.

Viewing these contracts in the light most favorable to Relators, the Court does not find that they demonstrated to WWS that the management companies or the other Defendants wielded such power over the CAHs that WWS knew that the companies could "significantly . . . influence or direct the action or policies of" the CAHs. *See* 42 C.F.R. § 413.17(b)(3) (defining amount of control necessary to be a related organization). While the contracts discuss numerous powers for the administrator, they also clearly state that the administrator's authority is limited to performing "day-to-day" tasks, with approval of the trustees required for any substantial expenditure or approval of long-term contracts. Ex. [251-1] at 1-2; *see also* Ex. [251-2] at 1-2; [251-3] at 1-2; [251-4] at 1-2. Further, a separate agreement in writing by the trustees was necessary for the management company to provide certain additional services, *see, e.g.*, Ex. [251-1] at 4, and the trustees could seek removal and replacement of the administrator if dissatisfied, *see, e.g.*, *id.* at 4-5. These provisions appear to limit the administrator to whatever influence the trustees would authorize him to assert. While the administrators may have wielded sufficient power in practice as to make the management companies qualify as

related organizations, as it relates specifically to WWS the Second Amended Complaint [228] points only to WWS's knowledge of the contracts' terms rather than knowledge of how the contracts were implemented. *See* 2d Am. Compl. [228] at 44-45, 47-48. Without providing a sufficient factual basis to infer that WWS had a more complete understanding of how the administrator and the management company were permitted to direct the hospital beyond merely what is stated in the contracts, Relators have not plausibly shown that WWS acted with reckless disregard of the truth or falsity of the relationship between the management company and the hospital based upon the language in the contracts. *See* § 3729(b)(1).

Relators' claims regarding WWS's scienter in the context of FCMH and TGH also suffer from the same weaknesses as those for NSMC. Relators' allegations that WWS's communications with the hospital's administrator about the cost reports should have alerted it to greater authority fall short because the hospitals entered into the initial agreement specifically to help with the cost reports. *See* 2d Am. Compl. [228] at 26-28, 36-37, 45-46, 48-49. Therefore, rather than suggesting outsized power asserted by the administrator, in substance this merely alleges that as far as WWS knew, the administrator was acting within the limited role of helping maximize the hospital's finances.

Likewise, Relators' statements that WWS relied on others to determine which costs were allowable is indicative that WWS likely believed the responses it authored in the cost reports were accurate rather than false. *See id.* at 45

("Defendant WWS . . . routinely relied on Wayne Walters to make final decisions on behalf of FCMH about FCMH finances and which items to include as purportedly 'allowable' costs in Medicare cost reports for FCMH."); *id.* at 48 ("WWS in the course of emails directly with Defendant Blackwood, routinely relied on Blackwood to make decisions on behalf of TGH about TGH finances and which items to include as purportedly 'allowable' costs in Medicare cost reports for TGH."). Given that Blackwood, as administrator of TGH,[3] was tasked with signing and submitting the reports to Medicare, *id.* at 31, 43, 48-49, and therefore certifying the accuracy of the reports, *id.* at 8-9, these allegations do not plausibly suggest that WWS's conduct surpassed gross negligence in its preparation of the TGH cost reports. *See Farmer*, 523 F.3d at 339; *see also United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 695 (S.D.N.Y. 2018) (finding insufficient allegations of knowledge under the FCA where the defendants had submitted their claim amounts in reliance on others who "had a fiduciary duty to honestly represent their costs").

Regarding WWS's reliance on Wayne Walters, who served as an administrator for NSMC, *id.* at 22-23, appointed and employed FCMH's administrator, *id.* at 41-42, and operated the company whose costs to FCMH were allegedly incorrectly claimed to be "reasonable, necessary[, and] customary," *id.* at 40, 42, Relators' allegations fail to provide a factual basis to infer that WWS had obvious reason to doubt the accuracy of the information it received from Wayne

---

[3] Though the contracts [251-3][251-4] note Marlow as the initial administrator, Relators allege that Blackwood became the administrator of TGH at some point. *See* 2d Am. Compl. [228] at 30, 47. Relators specifically allege that "Blackwood signed all such cost reports on behalf of TGH." *Id.* at 31.

Walters. Without this basis, Relators' assertions regarding FCMH do not plausibly

suggest WWS had the requisite scienter under the FCA. *See Farmer*, 523 F.3d at

339.

C.    <u>Conspiracy to present false claims and to make false statements material to a
      false claim under § 3729(a)(1)(C)</u>

WWS contends that Relators have failed to plausibly allege that it conspired

with the other Defendants to present a false claim or to make a false statement

material to a false claim. Mem. [240] at 15-16.  To state a claim for conspiracy under

the FCA, Relators must show (1) that Defendants unlawfully agreed to present a

false claim or make a false statement material to a false claim and (2) at least one

act performed in furtherance of that agreement. *Farmer*, 523 F.3d at 343. This

requires demonstrating a specific intent to defraud. *Id.*

Relators maintain that the Second Amended Compliant [228] adequately

pleads an FCA conspiracy as to WWS because it agreed to prepare the reports,

denied the existence of related-organization costs, offered the reports to the

hospitals, and the hospitals and other Defendants "by obvious implication agreed to

do what WWS had recommended they do" when other Defendants actually

submitted the reports. Resp. [245] at 20-21.

These allegations are insufficient to demonstrate that WWS entered into an

agreement to defraud the government. The Second Amended Complaint [228]

makes several conclusory statements that WWS agreed with the other Defendants

to submit cost reports with unallowable costs. 2d Am. Compl. [228] at 31, 34, 41-42,

46, 49, 51. Mere legal conclusions that an agreement existed are insufficient to state

a conspiracy claim, *see Twombly*, 550 U.S. at 564, and nothing alleged in the Second

Amended Complaint [228] besides WWS's preparation of these cost reports for the

hospitals during the relevant time period suggests any type of agreement on WWS's

part to defraud. Allegations of false claims submitted over a period of years can

create the possibility of an unlawful agreement, but are insufficient, on their own,

to surpass the plausibility requirement of Rule 12(b)(6). *Grubbs*, 565 F.3d at 194

("Even taking the allegations as true—that various doctors over a period of years

each submitted certain false claims—does not, by itself, do more than point to a

possibility of an agreement among them."). These conclusory assertions, along with

Relators' failure to plausibly allege that WWS had knowledge of the false claims in

the cost reports, fall short of stating an FCA conspiracy claim against WWS.

D.    Denial of leave to amend

      Though Relators have not requested leave to amend, the Court further finds

that Relators should not be granted leave to amend their complaint in lieu of

dismissal of their claims against WWS. This case was originally filed on February

18, 2016, and Relators have already amended their complaint twice. Relators' most

recent amendment was granted after WWS had filed a Motion [172] to Dismiss

which addressed the same pleading deficiencies raised in WWS's present Motion

[239]. *See generally* Mot. [172]; Mem. [173], Text Only Orders, June 30, 2022

(granting leave to amend and denying WWS's Motion [172] to Dismiss without

prejudice in light of Order granting leave to amend); Mot. [239]; Mem. [240]. WWS's

initial Motion [172] to Dismiss was filed on August 30, 2021, eight months before

Relators filed their proposed second amended complaint on April 28, 2022. *See* Mot. [172]; Mot. [226]. Relators have therefore had a previous opportunity and significant time to address the insufficiency of their claims against WWS. Allowing additional amendments would further delay this case, and Relators have not indicated any new facts that they could provide that would cure the deficiencies in their allegations against WWS. Accordingly, Relators should not be permitted to amend their complaint to retain their claims against WWS. *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003) (noting undue delay, failing to cure deficiencies by previous amendments, and futility of amendment as grounds for denying leave to amend).

## III. CONCLUSION

To the extent the Court has not addressed any of the parties' arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant Watkins Ward & Stafford PLLC's Motion [239] to Dismiss is **GRANTED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendant Watkins Ward & Stafford PLLC's filing docketed as Supplemental Motion [251] to Dismiss is **DENIED** as moot in light of the Court granting Motion [239].

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Relators Mitchell D. Monsour and Walton Stephen Vaughan's claims against Defendant Watkins Ward & Stafford PLLC are **DISMISSED WITH PREJUDICE**.

**SO ORDERED AND ADJUDGED**, this the 9th day of November, 2022.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE