**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**UNITED STATES** *ex rel.* **MITCHELL**                     **RELATORS**
**D. MONSOUR and WALTON**
**STEPHEN VAUGHAN**

**v.**                                             **Civil No. 1:16cv38-HSO-BWR**

**PERFORMANCE ACCOUNTS**
**RECEIVABLE, LLC, et al.**                              **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT BILLY NERREN MARLOW, JR.'S
MOTION [356] FOR PARTIAL SUMMARY JUDGMENT**

BEFORE THE COURT is Defendant Billy Nerren Marlow, Jr.'s Motion [356]

for Partial Summary Judgment, which seeks dismissal of certain of Relators

Mitchell D. Monsour and Walton Stephen Vaughan's claims under the False Claims

Act, 31 U.S.C. § 3729, et seq., based upon the expiration of the relevant statute of

limitations. After due consideration of the Motion [356], the parties' submissions,

and relevant legal authority, the Court finds that the Motion [356] should be

granted in part and denied in part, and that Relators Mitchell D. Monsour and

Walton Stephen Vaughan's claims against Defendant Billy Nerren Marlow, Jr.

based on Medicare cost reports submitted for payment by North Sunflower Medical

Center and Tallahatchie General Hospital before October 18, 2012, should be

dismissed with prejudice based upon the expiration of the relevant statute of

limitations.

## I. BACKGROUND

A.   Factual background

1.   Medicare cost reports

In 2016, Mitchell D. Monsour and Walton Stephen Vaughan ("Relators"), acting as Relators on behalf of the United States, filed a Complaint [3] in this Court under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. Relators have since amended their Complaint twice. The Second Amended Complaint [228], the current operative pleading, names as Defendants Performance Accounts Receivable, LLC, Performance Capital Leasing, LLC, Wade Walters, Billy Nerren Marlow, Jr., Wayne Walters, CAH Management-Franklin Services LLC, Revenue Cycle Management-Franklin LLC, Donald J. Blackwood II, Sunflower Management Holding Company LLC, and Watkins Ward & Stafford PLLC (collectively "Defendants").[1] 2d Am. Compl. [228] at 3-5. Relators allege that Defendants violated the FCA by submitting Medicare cost reports that included unallowable costs. *See generally id.* A more detailed discussion of Medicare cost reports is contained in the Court's Order [381] Granting Defendants Donald J. Blackwood II, and Sunflower Management Holding Company LLC's Motion [279] for Partial Summary Judgment, which is adopted and incorporated herein by reference. *See* Order [381].

---

[1] The Court dismissed Watkins Ward & Stafford PLLC from this case on November 9, 2022. *See* Order [255] at 23-24. Performance Capital Leasing, LLC was dismissed on June 1, 2023, on Relators' Motion [274] to Voluntarily Dismiss. *See* Order [278] at 2-3. The other Defendants listed in the Second Amended Complaint [228] remain.

2.   <u>North Sunflower Medical Center</u>

Relators allege that in 2007, Defendant Wade Walters formed an entity named Performance Accounts Receivable, LLC ("PAR") and entered into a "Revenue Cycle Management Services Agreement" with North Sunflower Medical Center ("NSMC"), where NSMC paid PAR seven percent of all revenue it received from "all medical or other services to all patients for all 'inpatient, outpatient, swing bed and (geriatric psychiatric services)' . . . ." 2d Am. Compl. [228] at 16.[2] PAR promised to perform "Business Office Management as well as Revenue Cycle Management Services for [NSMC]." *Id.* at 17. Defendant Billy Nerren Marlow, Jr. ("Marlow") served as Administrator of NSMC from 2004 until 2012, and as the Executive Director of NSMC from 2004 through 2015. *Id.* Relators assert that either as Administrator or Executive Director, Marlow signed the 2007 agreement between PAR and NSMC, as well as approved payments to PAR. *Id.* Marlow "signed successor agreements between the same parties entitling PAR, through October of 2015, to the same compensation." *Id.*

Between 2009 and 2016, Marlow allegedly personally approved $15,159,398.52 in payments to PAR under the agreements, with monthly payments at times exceeding $250,000.00. *Id.* at 17-18. By signing the annual Medicare cost reports, which included the payments to PAR, "Marlow affirmed that those costs were reasonable, necessary, and allowable under Medicare cost report laws . . . ." *Id.* at 18.  Additionally, by signing the Medicare cost reports, Marlow certified to

---

[2] In September 2014, NSMC renewed its contract with PAR, but reduced the percentage it received from seven percent to five percent. 2d Am. Compl. [228] at 24.

Medicare officials that he examined the representations made within each cost report, and "that all such expenses or costs for all relevant services had been privided [sic] in compliance with Medicare laws and regulations." *Id.* According to Relators, all such certifications made by Marlow with respect to Medicare cost reports and the payments by NSMC to PAR "were knowingly false when made, making each such cost report a materially false statement and a legally false claim (for future per diem Medicare payments) within the meaning of the False Claims Act." *Id.* Specifically, Relators assert Marlow knew the costs NSMC paid to PAR were not commercially necessary or related to the market value of the work performed, and thus were not allowable costs to be included in Medicare cost reports as represented. *Id.* at 20-21.

In 2012, Defendant Wayne Walters was "installed" as Administrator of NSMC by Wade Walters (his brother) and Marlow, who retained the role of Executive Director. *Id.* at 21-22. Relators contend that, from July 2012 through June 2015, Defendant Wayne Walters in his role as Administrator of NSMC, "knowingly agreed to the continuance of all NSMC agreements with and payments to his brother, Wade Walters," and thus agreed to all transactions with Wade Walters. *Id.* at 23. In August 2012, Marlow allegedly misrepresented to the NSMC Board that PAR was performing the same service as another billing and collections company the hospital had previously used, Perot Company ("Perot"). *Id.* Instead, Perot only received a percentage of collections based on work its own employees did, as opposed to PAR, which received a percentage of all revenue NSMC received. *Id.*

PAR also arranged and recommended the acquisition of new services to maximize Medicare reimbursement, whereas Perot only engaged in billing and collection activities. *Id.* Relators maintain that Defendant Wayne Walters "agreed for Marlow to make such misrepresentations to the NSMC Board, knowing that they were materially false." *Id.* at 24.

As a result of the foregoing, Relators assert that from 2012 through 2014 Marlow, along with Wade Walters, Wayne Walters, and PAR, caused Medicare to pay NSMC at least an additional $14,403,757.00 in "per diem" amounts based upon Medicare claims submitted for payment after March 2010. *Id.* at 25.

3.   Tallahatchie General Hospital

In 2010, Wade Walters and Marlow formed Sunflower CAH Management Group LLC ("Sunflower Management"), which was initially owned entirely by Marlow before Defendant Donald J. Blackwood II ("Blackwood") became a part owner in 2011. *Id.* In 2010, TGH entered into an agreement with Sunflower CAH Management LLC, giving the company management powers over the hospital, including the ability to hire and fire the TGH Chief Executive Officer and Administrator. *Id.* at 25-26. TGH also entered into a contract with Sunflower Revenue Cycle Management LLC ("Sunflower RCM"), a separate entity, to "perform 'revenue cycle services' for TGH[.]" *Id.* at 27.

As part of Sunflower Management's agreement with TGH, it received five percent of the total net amount it collected for all patient and non-patient services TGH provided. 2d Am. Compl. [228] at 26. Sunflower RCM  had a similar

agreement with TGH, which included the same provision but at a seven-percent rate of the total net amount collected. *Id.* at 28. Since November 2010, TGH has allegedly paid Sunflower Management at least $8,927,043 in fractional fees and has paid to Sunflower RCM at least $10,807,069 in fractional fees. *Id.* 27, 29. Relators allege that none of these payments were commercially reasonable or necessary and were not within any range of what is competitive in the market. *Id.* at 29-30. Thus, all such payments were not allowable costs to be included in Medicare cost reports submitted by TGH. *Id.* at 30.

Relators assert that despite this, Marlow, among others, agreed with Sunflower Management, Sunflower RCM, and TGH for each Medicare cost report submitted by TGH to include "the amounts of all such costs to TGH of paying that year all such fractional fees to Sunflower Management and Sunflower RCM, inherently, knowingly, and falsely representing to Medicare cost report reviewers that all such costs were reasonable, necessary and allowable." *Id.* at 31. Blackwood and Marlow allegedly distributed to themselves over $14.6 million in profits from fractional fee payments by TGH. *Id.* at 31. Relators assert this conduct by Marlow and Blackwood "caused the submission by TGH of false cost reports and false monetary claims to Medicare . . . in violation of the False Claims Act. 31 U.S.C. § 3729." *Id.* at 34.

B.    Procedural History

On February 8, 2016, Monsour and Vaughan, acting as Relators on behalf of the United States (collectively "Relators"), filed a Complaint [3] in this Court

advancing claims under the FCA. *See* Compl. [3]; 31 U.S.C. § 3279 et seq.  The

Attorney General of the United States of America ("United States" or "the

Government") was served with the Complaint [3] on April 18, 2016, Memo. [5] at 1

(filed under seal), and "it appears the United States Attorney was provided a copy of

the disclosure on or about May 5, 2016[,]" *id.* The Government declined to

intervene. Not. [13] at 1. On October 18, 2018, Relators filed a Motion [107] for

Leave to File First Amended Complaint, attaching a copy of the Proposed First

Amended Complaint [107-1], [107-2]. *See* Mot. [107]; Proposed 1st Am. Compl. [107-

1], [107-2]. That Motion [107] was denied without prejudice when this case was

stayed on October 26, 2018, due to former Defendant Hope Thomley's ("Thomley")

criminal indictment on Medicare fraud.[3] Orders [116], [117], at 1. The Order [116]

denying the motion stated that "[t]he Court, having determined that this case

should be stayed and administratively closed, finds that the pending Motion to

Amend (ECF No. 107) . . . should be **denied without prejudice to the parties'**

**rights** to reassert any unresolved issue when the stay is lifted." Order [116] at 1

(emphasis added).

Over time Relators filed three separate Motions [119], [125], [133] to Reopen

the Case and Lift Stay, the first two of which were denied due to the ongoing

criminal proceedings. Text Only Order, April 4, 2019; Text Only Order, August 23,

2019. Following the resolution of the criminal case, the third Motion [133] to Reopen

Case and Lift Stay was granted, and this case was reopened on May 21, 2021. Order

---

[3] Former Defendant Hope Thomley was named as a defendant in Relators' Original Complaint [3]
and was dismissed on June 11, 2021. *See* Order [154] at 2.

[149] at 1. Relators refiled their Motion [150] for Leave to File First Amended Complaint on May 24, 2021, again attaching a copy of their Proposed First Amended Complaint [150-1]. *See* Mot. [150]; Proposed 1st Am. Compl. [150-1]. This Motion [150] was granted and Relators filed their First Amended Complaint [158] on July 2, 2021. Text Only Order, July 1, 2021; *see also* 1st Am. Compl. [158]. Relators have since filed a Motion [226] for Leave to File their Second Amended Complaint [228] on April 28, 2022, which the Court granted on June 30, 2022. *See* Mot. [226]; Text Order, June 30, 2022; *see also* 2d Am. Compl. [228]. The Second Amended Complaint [228] alleges that Defendants violated the FCA by submitting Medicare cost reports that included unallowable costs. *See generally* 2d Am. Compl. [228].

C.   Billy Marlow's Motion [356] for Partial Summary Judgment

1.   Marlow's Motion [356]

Marlow's Motion [356] for Partial Summary Judgment requests that the Court dismiss Relators' claims against him involving Medicare cost reports submitted for payment by NSMC before May 24, 2015, and by TGH before April 28, 2016, on grounds that such claims are time-barred by the FCA's six-year statute of limitations. Mot. [356] at 1; *see also* 31 U.S.C. § 3731 (b)(1). Marlow argues that since the first Motion [107] for Leave to File Amended Complaint, filed on October 18, 2018, was denied, the statute of limitations was not tolled and instead only tolled when Relators filed their second Motion [150] for Leave, which was ultimately granted, on May 24, 2021. Mem. [357] at 10. He asserts this is because the Court's

Order [117] administratively staying the case did not explicitly toll the statute of limitations. *Id.* at 11; *see also* Order [117].

Thus, in Marlow's view, all claims against him based on Medicare cost reports submitted by NSMC for payment before May 24, 2015, are time-barred. Mem. [357] at 10. Marlow asserts that only NSMC claims were properly asserted in the First Amended Complaint [158], such that claims against him related to TGH were not properly asserted until Relators filed their Second Amended Complaint [228] on July 1, 2022. *Id.* at 10-11. Marlow maintains that this is because the claims based on cost reports submitted by TGH to Medicare involving fees paid to Sunflower Management and Sunflower RCM were not asserted by Relators until they filed their Motion [226] for Leave to File Second Amended Complaint on April 28, 2022. *Id.* Only then was the statute of limitations tolled, such that Marlow argues that all claims against him related to TGH's Medicare cost reports submitted for payment before April 28, 2016, are time-barred. *Id.* at 14.

2.     Relators' Response [386]

Relators respond that the filing of their first Motion [107] for Leave to File Amended Complaint on October 18, 2018, tolled the statute of limitations, citing the Court's previous Order [382] holding such as it related to Defendant Wayne Walters. Resp. [386] at 3-4 (citing Order [382] at 36). Relators argue the reasoning in the Court's Order [382] applies equally to the timeliness of the claims against Marlow. *Id.* at 4.

9

As it relates to the TGH claims specifically, Relators maintain that the claims in the Second Amended Complaint [228] relate back to the First Amended Complaint [158] under Federal Rule of Civil Procedure 15(c)(1)(B) and based upon the filing of the 2018 Motion [107] to amend. *Id.* at 7-10; *see also* Fed. R. Civ. P. 15(c)(1)(B). They assert that the Second Amended Complaint [228] merely amplified the allegations already made, and that Marlow was placed on notice of the FCA claims against him as it related to TGH when Relators filed their 2018 Motion [107] for Leave to File First Amended Complaint. Resp. [386] at 7-10. For this reason, the statute of limitations was tolled as to TGH claims against Marlow on October 18, 2018, making all claims based on TGH's Medicare cost reports filed after October 18, 2012, timely. *Id.*

3.   Marlow's Reply [400]

In his Reply [400], Marlow argues that the Court should reconsider its Order [382] granting in part and denying in part partial summary judgment as it related to Defendant Wayne Walters. Reply [400] at 2-12. He contends that a motion to amend that is denied cannot toll the statute of limitations. *Id.* at 5-8. Marlow then asserts that the stay entered by the Court did not operate as an extraordinary circumstance beyond Relators' control because Relators could have filed their First Amended Complaint before October 2018, or sought reconsideration of the Order [117] to stay. *Id.* at 8-11.

Defendant also cites *United States v. Corp. Management, Incorporated*, to argue that the First Amended Complaint [158] did not base its allegations on the

same facts as those in the Second Amended Complaint. *Id.* at 12-15 (citing *United States v. Corp. Mgmt., Inc.*, 78 F.4th 727, 742-43 (5th Cir. 2023)). Marlow posits that the First Amended Complaint [158] and the Second Amended Complaint [228] base their allegations on different contracts between TGH and certain entities. *Id.* Specifically, that the First Amended Complaint [158] only makes allegations involving Sunflower Management's contract, and makes no mention of the Sunflower RCM contract. *Id.* Marlow reasons that, as set out in *Corporate Management*'s discussion of *United States ex rel. Miller v. Bill Harbert International Construction, Incorporated*, the different contracts constituted different transactions or occurrences such that Rule 15(c)(1)(B) cannot relate them back. *Id.* (citing *Corp. Mgmt., Inc.*, 78 F.4th at 742-43 (discussing *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 882 (D.C. Cir. 2010)).

## II. DISCUSSION

### A.   Relevant legal authority

### 1.   Summary judgment standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the "the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001) (quotation omitted); *see also Aries Bldg. Sys., LLC v. Pike Cnty.,*

*Mississippi*, 5:16-CV-16-DCB-MTP, 2017 WL 4678225, at *2 (S.D. Miss. Oct. 17, 2017).

If a movant carries its initial burden, the nonmovant must then present evidence beyond the pleadings that demonstrates "specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021). To rebut a properly supported motion for summary judgment, the nonmovant must show, with "significant probative evidence," that there exists a genuine issue of material fact for resolution at trial. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A court must "view the evidence in the light most favorable to the nonmovant and construe all reasonable inferences in [his] favor" and "may not evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes." *Guzman*, 18 F.4th at 160 (quotation omitted).

2.    <u>The FCA's statute of limitations</u>

The FCA provides that:

(b) A civil action under section 3730 may not be brought—

(1) more than 6 years after the date on which the violation of section 3729 is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the

circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

31 U.S.C. § 3731(b).

The FCA thus sets forth two limitations periods upon which a relator may rely to bring FCA claims. *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1510 (2019) ("The False Claims Act contains two limitations periods that apply to a 'civil action under section 3730 . . . .'"). "Whichever period provides the later date serves as the limitations period." *Id.* None of the parties to the present Motion [356] have argued or suggested that the three-year statute of limitations applies, so the Court will confine its analysis to the FCA's six-year limitations period, *see generally* Memo. [357]; Resp. [386]; Reply [400], which allows a relator to bring an action six years from the date on which the violation was committed, *id.* at 1513

3.   Federal Rule of Civil Procedure 15(c)

Under Federal Rule of Civil Procedure 15(c)(1),

An amendment to a pleading relates back to the date of the original pleading when: . . .

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out– in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in
defending on the merits; and

(ii) knew or should have known that the action would have been brought
against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(B)-(C).

Rule 15(c) "allows amendments otherwise time-barred to 'relate back' to the
date of the original pleading." *Fed. Deposit Ins. Corp. v. Bennett*, 898 F.2d 477, 479
(5th Cir. 1990). "Newly asserted claims relate back if they are premised on the
same or similar allegations as those in the original filing." *United States v. Alaniz*, 5
F.4th 632, 636 (5th Cir. 2021). "Amendments that correct technical deficiencies in a
pleading or serve to expand the facts alleged in the original pleading satisfy the
relation back requirements of rule 15(c)." *McClellon v. Lone Star Gas Co.*, 66 F.3d
98, 102 (5th Cir. 1995) (quoting 6A Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure* § 1497 at 74 (2d ed. 1990)). "Similarly, if an
amendment simply restates with greater particularity or amplifies the details of the
complaint, then the amendment qualifies as information that the complainant
'attempted to set forth.'" *Id.* (quoting Wright & Miller, *supra*, § 1497 at 76). On the
other hand, if the alteration "in an amended complaint is 'so substantial that it
cannot be said that the defendant was given adequate notice of the conduct,
transaction, or occurrence that forms the basis of the claim or defense, then the
amendment will not relate back.'" *Federal Deposit Ins. Corp. v. Conner*, 20 F.3d
1376, 1386 (5th Cir. 1994) (quoting Wright & Miller, *supra*, § 1496 at 79).

B.    Analysis

1.    Whether Relators have shown entitlement to tolling of the six-year statute of limitations as to their NSMC claims against Marlow

The Court has previously addressed this question as it relates to Defendant Wayne Walters, and for the same reasons given in its Order [382] Granting in Part and Denying in Part Summary Judgment, the Court finds the statute of limitations should be tolled as to Relators' NSMC claims against Marlow. Order [382] at 28-36.

The parties do not dispute that the six-year statute of limitations period set forth at § 3731(b)(1) controls. *See* Mem. [357] at 1; Resp. [305] at 3. Marlow argues that as to the NSMC claims against him, the six-year period was tolled three days after the stay was lifted when Relators filed their second Motion [150] for Leave to File Amended Complaint on May 24, 2021, Mem. [357] at 10; *see also* Order [149], meaning that any NSMC claims against Marlow based on Medicare cost reports submitted before May 24, 2015, are time-barred, *see* 31 U.S.C. § 3731(b)(1).

Relators maintain that the "equities in this case vividly illustrate the procedural justice" of tolling the statute of limitations upon the filing of a motion to amend. Resp. [386] at 6. In their view, the statute of limitations was tolled upon the filing of their first Motion [107] for Leave to Amend on October 18, 2018, prior to the entry of the stay. *Id.* If the period was tolled upon the filing of the 2018 Moton [107], Relators can pursue NSMC claims against Marlow based on Medicare cost reports submitted for payment after October 18, 2012. *See* 31 U.S.C. § 3731(b)(1).

The parties do not dispute that the filing of a motion for leave to file an amended complaint that is subsequently granted tolls the statute of limitations.

15

Mem. [357] at 10, Resp. [386] at 4-6. As such, it is undisputed that, at the latest, the statute of limitations was tolled as to the NSMC claims when Relators filed their Motion [150] for Leave to File Amended Complaint on May 24, 2021. Mem. [357] at 10, Resp. [386] at 4-6. The dispute is whether the Motion [107] for Leave filed on October 18, 2018, which was denied, tolled the statute of limitations sooner.

Marlow argues that since the the Motion [107] for Leave filed on October 18, 2018, was denied due to the Court staying this case, *see* Order [116], and because the Court's Order [117] administratively staying the case did not explicitly state that it tolled the statute of limitations, the statute continued to run, Mem. [387] at 11. Relators disagree.

In *Hughes v. Region VII Area Agency on Aging*, the Sixth Circuit addressed similar facts and found tolling was appropriate where a motion to amend had been denied. 542 F.3d 169, 188 (6th Cir. 2008). The initial motion for leave to amend was denied because plaintiff "failed to comply with a local court rule requiring 'a movant to seek concurrence in the relief requested before filing a motion with this Court.'" *Id.* The plaintiff there eventually complied with the local rule, leave was granted, and the plaintiff filed a second amended complaint. *Id.* The Sixth Circuit held that defendants were not prejudiced because the substance of plaintiff's claims was made known to them upon the filing of the motion to amend, even though it had initially been denied.[4] *Id.* at 188-89.

---

[4] Notably the district court's denial of plaintiff's motion in *Hughes* made no mention of tolling the statute of limitations. *See Hughes v. Region VII Area Agency on Aging, et al.*, No. 04-10355-BC (E.D. Mich. July 27, 2006). Instead, it only denied the motion without prejudice. *Id.* at 2.

In both of Relators' Motions [107], [150] for Leave to Amend and the attached complaints, they did not change the facts or grounds upon which their claims were based, as both Motions [107], [150] attached Proposed First Amended Complaints [107-1], [107-2], [150-1], which were based on the "same general pattern of transactions originally and currently alleged [in the Original Complaint [3]], involving Medicare cost reports filed by the same three rural hospitals . . . ." Mot. [107] at 2; Mot. [150] at 2; *see also generally* Proposed 1st Am. Compl. [107-1], [107-2]; Proposed 1st Am. Compl. [150-1].  The Proposed First Amended Complaints [107-1], [107-2], [150-1] "invok[ed] the same initial three subsections of the False Claims Act . . . ." Mot. [107] at 3; Mot. [150] at 3; *see also generally* Proposed 1st Am. Compl. [107-1], [107-2]; Proposed 1st Am. Compl. [150-1]. The only differences were that the proposed amendments described the same transactions in greater detail, added multiple parties, and conformed themselves to the Court's Order [105] Granting in Part and Denying in Part Summary Judgment. Mot. [107] at 3; Mot. [150] at 3; *see also generally* Proposed 1st Am. Compl. [107-1], [107-2]; Proposed 1st Am. Compl. [150-1].

Relators first sought leave to file a first amended complaint on October 18, 2018, one day before former Defendant Thomley moved to stay proceedings. *See* Mots. [107], [111]. Before Relators had an opportunity to respond, the Magistrate Judge ordered the case stayed, and in doing so denied Relators' Motion [107] "without prejudice to the parties' rights to reassert any unresolved issue when the stay is lifted." Order [116] at 1; *see also* Order [117]. Relators then "diligently []

17

pursued relief[,]" *Sehr v. Val Verde Hosp. Corp.*, 368 F. Supp. 3d 1106, 1108 (W.D. Tex. 2019), by filing three Motions [119], [125], [133] to Reopen Case and Lift Stay, *see* Mots. [119], [125], [133]. As Relators had no control over when the United States Attorney brought criminal charges against Thomley, or how quickly the criminal case progressed, the stay administratively closing the case operated as an "an external obstacl[e] to timely filing" which was brought on by circumstances "beyond [Relators'] control." *Farmer v. D & O Contractors, Inc.*, 640 F. App'x 302, 306 (5th Cir. 2016) (quoting *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 256 (2016)).

It would unfairly punish Relators, who otherwise would have tolled the statute of limitations with the filing of their Motion [107] on October 18, 2018, because the Court opted to administratively close the case in the interests of protecting Thomley's Fifth Amendment rights. *See* Order [117] at 1. This is particularly true here, where the public filing of the 2018 Motion [107] and the attached Proposed First Amended Complaint [107-1], [107-2] placed Defendant Marlow on notice of the potential NSMC claims against him, removing any potential risk of prejudice. *See, e.g.*, *Hughes*, 542 F.3d at 188-89.

Alternatively, even if Marlow is correct that the Court's Order [117] staying this case had to expressly toll the statute of limitations in order for tolling to apply, the Court explicitly stated it was denying Relators' Motion [107] to Amend "**without prejudice to the parties' rights to reassert any unresolved issue** when the stay is lifted." Order [116] at 1 (emphasis added). Strict application of the

18

statute of limitations here would in essence be treating the Court's Order [116] as a denial with prejudice, which by its terms it was not. *See Khoury v. Thota*, No. 20-20578, 2021 WL 3919248 (5th Cir. Sept. 1, 2021) (unpublished) (holding that where a dismissal without prejudice may effectively operate as a final disposition of the claims due to a statute of limitations, it is treated as a dismissal with prejudice) (quoting *Boazman v. Econ. Lab'y, Inc.*, 537 F.2d 210, 213 (5th Cir. 1976); *Nottingham v. Warden, Bill Clements Unit*, 837 F.3d 438, 441 (5th Cir. 2016) (treating a Rule 41(b) dismissal without prejudice as one with prejudice where the statute of limitations would prevent refiling of the claims) (citing *Coleman v. Sweetin*, 745 F.3d 756, 766 (5th Cir. 2014) (per curiam)). As such, it seems clear that by reserving to Relators the right to refile their motion to reassert any unresolved issues, this encompassed the later presentation of claims that would have otherwise been timely. *See* Order [116].

In sum, Relators' first Motion [107] for Leave tolled the six-year statute of limitations as to the NSMC claims against Marlow on October 18, 2018.  Therefore, Relators may bring claims against Marlow based on Medicare cost reports submitted by NSMC after October 18, 2012. Relators base their NSMC claims against Marlow on conduct beginning in February 2007. 2d Am. Compl. [228] at 16-25. Thus, only a partial summary judgment dismissing Relators' NSMC claims against Marlow based on Medicare cost reports submitted before October 18, 2012, is warranted.

2.    Whether the 2018 Motion [107] for Leave tolled the six-year statute of limitations as to the TGH claims against Marlow

Marlow maintains that the TGH claims were not properly asserted against him until Relators filed their Second Amended Complaint [228] on July 1, 2022, and were only tolled when Relators filed their Motion [226] for Leave to File Second Amended Complaint on April 28, 2022. Mem. [357] at 10-11. Thus, even if the statute of limitations was tolled as to the NSMC claims in the First Amended Complaint [158], it was not tolled as to the TGH claims based on Medicare cost reports submitted for payment before April 28, 2016. *Id.* at 10-14. Relators respond that the Second Amended Complaint [228] merely amplified the TGH claims asserted in the First Amended Complaint [158], such that they relate back to the First Amended Complaint [158] under Rule 15(c)(1)(B), and are subject to the tolling based upon the filing of the 2018 Motion [107] to Amend. *Id.* at 7-10; *see also* Fed. R. Civ. P. 15(c)(1)(B). Marlow argues the claims do not relate back because the First Amended Complaint [158] and Second Amended Complaint [228] base their allegations on different contracts between TGH and different Sunflower entities. Reply [400] at 12-15 (citing *Corp. Mgmt., Inc.*, 78 F.4th at 742-43 (discussing *Miller*, 608 F.3d at 882)).

To resolve this question the Court must determine whether the allegations in the Proposed First Amended Complaint [107-1], [107-2] attached to the 2018 Motion [107] for Leave were sufficient to permit the Second Amended Complaint [228] to relate back to them.

Under Federal Rule of Civil Procedure 15(c)(1)(B),

An amendment to a pleading relates back to the date of the original pleading when: . . .

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading . . . .

Fed. R. Civ. P. 15(c)(1)(B).

This Court has previously applied Rule 15(c)(1)(B) to FCA claims. *See, e.g.*, *United States ex rel. Rigsby v. State Farm Fire and Cas. Co.*, No. 1:06-CV-433-HSO-JCG, 2021 WL 1170086, at *15-17 (S.D. Miss. Mar. 26, 2021); *see also United States v. Kaplan, Inc.*, 517 F. App'x 534, 536 (9th Cir. 2013); *United States ex rel. Woodard v. DaVita, Inc.*, No. 1:05-CV-227, 2010 WL 11531271, at *14 (E.D. Tex. Dec. 21, 2010) (collecting cases).

In *Rigsby*, the first amended complaint alleged that State Farm used its XacTotal software to make determinations regarding total flood loss on homeowners insurance claims following Hurricane Katrina. *Id.* at *17. The Court concluded that even though XacTotal was not a line-by-line estimating software, this was nevertheless sufficient for the second amended complaint, which was filed almost 15-years later, to relate back its allegations that State Farm was required to perform line-by-line estimates as to each property and failed to do so. *Rigsby*, 2021 WL 1170086, at *17. The assertion that State Farm was required to use line-by-line estimation, which predominated the second amended complaint, related back to the first amended complaint even though the first amended complaint made no mention of a line-by-line procedure and only mentioned the use of XacTotal in one

21

paragraph. *See generally* 1st Am. Compl. [16], 2d Am. Compl. [1623], *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, No. 1:06-CV-433-HSO-JCG, 2021 WL 1170086 (S.D. Miss. Mar. 26, 2021). The Court found that because the two complaints set out the same "central theme[,]" that State Farm had improperly used an expedited procedure, the assertions in each complaint were born out of "the same conduct, transaction, or occurrence." *Rigsby*, 2021 WL 1170086, at *15-17.  This was sufficient for them to relate back under Rule 15(c)(1)(B).

As in *Rigsby*, the central theme in both the Proposed First Amended Complaint [107-1], [107-2], which was ultimately filed after a second Motion [150] for Leave,[5] and the Second Amended Complaint [228] is the same. The Proposed First Amended Complaint [107-1], [107-2], raised the following allegations against Marlow as it related to TGH:

> 82. In 2010, Defendant Billy Marlow formed Sunflower CAH Management Group, LLC ("Sunflower CAH Management") for the purpose of receiving, on the model earlier demonstrated by Wade Walters, fractional fees from other cost-reimbursed CAH hospitals in rural Mississippi based on the amounts of their revenue. Defendant Wade Walters served as a "consultant" to Sunflower CAH Management.

> 83. In 2010 or 2011, Sunflower CAH Management, which at that time was owned entirely by Defendant Marlow, entered a fractional-fee "management contract" with Tallahatchie General Hospital ("TGH"),

---

[5] The TGH allegations made in the First Amended Complaint [158] are substantively identical to those made in the Proposed First Amended Complaint [107-1], [107-2]. *Compare* 1st Am. Compl. [158] at 35-38, 43-45, *with* Proposed 1st Am. Compl. [107-2] at 5-7, 13-15. The only differences relating to the TGH allegations are that the First Amended Complaint added "Marlow and" in paragraph 85, replaced the phrase "and effectively to select" with "select and" in paragraph 83, added the word "purportedly" in paragraph 98, and added the word "entire" in paragraph 99. *Compare* 1st Am. Compl. [158] at 36-37, 44-45, *with* Proposed 1st Am. Compl. [107-2] at 6, 14-15. As to the rest of the First Amended Complaint [158], the only material substantive difference is the addition of CAH Management Franklin Services LLC and Revenue Cycle Management Franklin LLC as Defendants, which the Court has already addressed in its previous Order [382]. *See* Order [382] at 28 n.4.

itself a CAH Hospital based in Charleston, Mississippi, under which TGH gave to Sunflower CAH Management the power to employ, and effectively to select, the Administrator charged with running TGH, and thus to control TGH's operations. In return, TGH also became contractually obligated to pay Sunflower CAH Management seven percent (7%) of all of the revenue TGH collected.

84. In March of 2011, Defendants Marlow and Wade Walters used the new power of Sunflower CAH Management over TGH to cause TGH to enter multiple contracts with Wade Walters, initially through the Walters-owned entity Prime Care Management Group LLC, under which that entity would establish, manage, and recruit patients for, a new [intensive outpatient service "IOP"] at TGH. . . .

. . .

86. Defendants Billy Marlow and Wade Walters, and Sunflower CAH Management (along with the TGH Administrator it appointed), caused TGH to pay Walters-owned Prime Care Management Group, between (and including) 2011 and 2014, a total of $2,104,137, all of which was falsely included in TGH's cost report as purportedly allowable costs. Those inclusions of those IOP costs, when adjusted to account for (a) the fraction of Medicare patients at TGH (relative to all patients), (b) the amounts of annual cost report "settlements" during those years, and (c) TGH's entitlement as a CAH to reimbursement equal to 101% of allowable Medicare-related costs, resulted in additional and unlawful "per diem" amounts to be paid by Medicare to TGH in amounts totaling approximately $2,607,811.

. . .

97. Beginning in 2010, Defendants Billy Marlow and Wade Walters, demonstrating and using their managerial influence and control (through "Sunflower CAH Management" and otherwise) over TGH, caused TGH to enter a contract with Walters-owned Delta Staffing LLC, under which TGH became obligated to pay Walters (through his Delta Staffing LLC entity) to utilize nurses and other health care providers employed as "contract employees" by Delta Staffing. TGH's contract with Delta Staffing LLC was signed on behalf of TGH, as its "Chief Executive Officer," by Defendant Billy Marlow.

98. In April of 2011, Defendants Billy Marlow and Wade Walters, through their substantial influence on TGH by virtue of Marlow's control of TGH's "management company" Sunflower CAH Management

Group LLC, caused TGH to become obligated to pay Wade Walters, through his entity Prime Care Management Group LLC (owned and controlled entirely by Walters), to establish and operate for TGH a "Rehabilitation Services" program in the name of and at TGH, purportedly delivering occupational, physical, and speech pathology rehabilitation services, in consideration of which Walters (through Prime Care Management Group LLC) was paid $10,000 each month for "managing" such a rehabilitation operation (in addition to TGH's obligation to reimburse Prime Care for its expenses in paying a physician actually to deliver services).

99. In 2011, Defendants Marlow and Wade Walters, as further demonstration and use of their influence over TGH and its "managing company," also caused TGH to become obligated to pay Wade Walters (through the Defendant Performance Capital Leasing LLC, owned and controlled entirely by Walters) lease payments in order for TGH to lease from [Performance Capital Leasing LLC ("PCL")] sixteen hospital beds. Though TGH made lease payments of over $180,000 to PCL during a lease period of less than five years, TGH valued the beds at the end of that period at only $1,000 per bed for the purpose of buying the beds outright from PCL.

Proposed 1st Am. Compl. [107-2] at 5-7, 13-15.

In comparison, as it relates to TGH claims against Marlow, the Second

Amended Complaint alleges that:

59. During 2010, Defendants Billy Marlow and Wade Walters formed the entity "Sunflower CAH Management Group LLC" (hereafter called "Sunflower Management"), initially owned entirely by Marlow but owned in part by Marlow and in part by Defendant Jim Blackwood from February 2011 until September 2019 (since which time it has been owned indirectly but entirely by Blackwood).

60. On or about November 11, 2010, Wade Walters and Billy Marlow convinced the Board of Trustees of the Tallahatchie General Hospital (hereafter called "TGH"), and TGH in a written contract agreed, to shift and delegate to Sunflower Management (and thus, initially, to Billy Marlow) the power to hire and fire the TGH Chief Executive Officer ("Administrator"), and the further powers to take all actions which in the discretion of Sunflower Management were necessary to manage and bind TGH in its operations, including the hiring, firing and discipline of employees and the purchasing and selling of property and services.

24

61. As part of the same November 11, 2010 Agreement between TGH and Sunflower Management, TGH became obligated each month to pay (and to this day is still contractually obligated to pay) Sunflower Management fully five percent (5%) of "the total amounts collected during the preceding calendar month for any and all patient and non-patient services provided by" TGH, reduced only by (a) any refunds paid by TGH and (b) County property tax revenues received by TGH.

62. The contractual and mathematical basis for calculating all fee payments by TGH to Sunflower Management during all months since November 2010 have therefore been made based on that calculation of 5% of TGH's total collections, regardless of the number of hours worked by any personnel of Sunflower Management in the interest of TGH. All such monthly fractional fee payments made by TGH to Sunflower Management have also had no economic relationship with, and have been grossly in excess of, both (a) the price or costs for which TGH could have procured the same management services from alternative providers, and thus (b) the true value in a competitive marketplace of any such services provided by Sunflower Management to TGH.

63. On or about November 10, 2013, Defendants Marlow and Blackwood agreed with TGH to renew the same contractual arrangement under the same terms (described in Paragraphs 60 and 61above [sic]), an arrangement which still governs the financial relationship between TGH and Sunflower Management.

64. Since November of 2010, TGH has paid Sunflower Management, and Defendants Marlow and Blackwood as overt acts pursuant to the contracts described above have received through Sunflower Management, at least $8,927,043 in fractional fees because of the contractual arrangement described above.

65. Also on November 11, 2010, Defendants Wade Walters and Billy Marlow also convinced TGH to enter a separate "Revenue Management and Consulting Agreement" with a separate entity, owned entirely by Billy Marlow and named "Sunflower Revenue Cycle Management LLC" (hereafter called "Sunflower RCM").

66. Under that separate contract, Sunflower RCM purportedly was to perform "revenue cycle services" for TGH, involving the preparation, submission and collection of bills and claims to insurers and uninsured patients for medical services provided by TGH.

67. As compensation by TGH for such purported additional services by Sunflower RCM, the same Agreement required TGH to pay to Sunflower RCM a further amount each month equal to seven percent (7%) of "the total amounts collected during the preceding calendar month for any and all patient and non-patient services" provided by TGH (again subtracting only "refunds" paid by TGH and County property tax revenue receipts). Their two fractional fee contracts, combined, entitled the jointly-owned Sunflower Management and Sunflower RCM to receive twelve percent (12%) of TGH's total collections as so defined.

68. On or about November 10, 2013, Defendants Marlow and Blackwood agreed with TGH to renew the same contractual arrangement between TGH and Sunflower RCM under the same terms (described in Paragraphs 66 and 67 above), an arrangement which still governs the financial relationship between TGH and Sunflower RCM.

69. From November of 2010 until the present time, substantially all of the actual "revenue cycle services" involving the actual preparation, submission and collection of bills and claims to insurers and uninsured patients of TGH have actually been performed not by employees of or at the expense of Sunflower RCM, but instead by employees of and at the expense of TGH itself, through TGH's own "revenue cycle" and "billing" personnel paid by TGH through its payroll.

70. Sunflower RCM has in fact never employed any person to perform any services for TGH, or for anyone or anything else, during its entire existence.

71. Nevertheless, TGH since 2011 has paid directly to Sunflower RCM (and thus, indirectly, to Defendant Marlow and, as of February of 2011, to Defendant Blackwood) at least $10,807,069 in fractional fees pursuant to the fractional fee contracts described above between TGH and Sunflower RCM.

72. All such fee payments by TGH to Sunflower RCM have been made each month since 2010 as a fraction of total collections by TGH as defined above, a basis for compensation which does not in itself depend on whether any personnel paid by Sunflower RCM had performed any particular services for TGH. The amounts of all such fee payments have also had no economic relationship with, and have been grossly in excess of, both (a) the price or costs for which TGH could have procured the same "revenue cycle services" from alternative providers, and thus (b) the true value in a competitive marketplace of any such services provided by Sunflower RCH (even if any had been provided) to TGH.

73. None of the over $19 million in total fractional fee payments made by TGH since 2010 to Sunflower Management and Sunflower RCM combined have been commercially reasonable or necessary in their amounts (or in the contractual basis for calculating their amounts), and none have been within any range of compensation ordinarily charged in any competitive marketplace for what services were promised to or actually performed for TGH. All such fee payments were therefore not reasonable, necessary or customary for the delivery of TGH's health care services to Medicare patients, were out of line with payments for such services by other hospitals in the competitive marketplace, and were otherwise not allowable costs for the purpose of being included in any Medicare cost report prepared for or submitted by TGH, within the meaning of 42 U.S.C. § 1395x(v)(1)(A) or 42 C.F.R. § 413.9.

. . .

75. Nevertheless, and in knowing violation of all such statutory and regulatory restrictions on costs legally allowed to be included on Medicare cost reports of CAH hospitals, Defendants Billy Marlow (from 2010 through September 2019), Jim Blackwood (from February 2011 until today), and Wayne Walters (between July 2014 and January 2016), each agreed with Sunflower Management, Sunflower RCM, TGH, and WWS for each annual Medicare cost report submitted by TGH to include (among many other "general and administrative" costs) the amounts of all such costs to TGH of paying that year all such fractional fees to Sunflower Management and Sunflower RCM, inherently, knowingly, and falsely representing to Medicare cost report reviewers that all such costs were reasonable, necessary and allowable. WWS falsely represented to TGH that cost reports including such costs were "suitable" for submission by TGH to Medicare, and Blackwood signed all such cost reports on behalf of TGH.

76. Between September of 2011 and September of 2020 alone, from the over $19 million paid by TGH in combined fractional fees to Sunflower Management and Sunflower RCM, Defendants Billy Marlow, Jim Blackwood and Wayne Walters disbursed to themselves (or otherwise to their own benefit), over and above all salary and bonus payments to Jim Blackwood and all other operational "costs" to Sunflower Management and Sunflower RCM, over $14.6 million in net profits. (Profits equal to one-third of overall profits were disbursed to Defendant Wayne Walters only between July 2014 and January of 2016.)

. . .

27

79. Nevertheless, Defendants Marlow, Blackwood, Wayne Walters (between July of 2014 and January 2016), and WWS each agreed with TGH, Sunflower Management and Sunflower RCM, and with one another, for TGH to submit to Medicare cost report reviewers cost reports for 2011 through 2020 which included, as purportedly allowable, the amounts of all such profits, in knowing violation of Medicare laws relating to related organizations.

80. Beginning in July of 2014, Defendants Billy Marlow, Jim Blackwood, and Wayne Walters together formed Defendant Sunflower Management Holding Company LLC (hereafter called "Sunflower Holding"), and assigned exclusive ownership of Sunflower Management and Sunflower RCM to Sunflower Holding, which continually since July of 2014 has been the owner of both such entities (each of which continues to contract directly with TGH). Billy Marlow, Jim Blackwood, and Wayne Walters each owned one-third of the ownership interests in Sunflower Holding, until January of 2016, after which Billy Marlow and Jim Blackwood each owned one-half of the ownership intersets [sic] in Sunflower Holding. Since September of 2019, Defendant Jim Blackwood has been the sole owner directly of Sunflower Holding, and thus indirectly the sole owner of both Sunflower Management and Sunflower RCM.

81. Since its formation as the owner of Sunflower Management and Sunflower RCM in July of 2014, Sunflower Holding has received all fractional fee payments thereafter made by TGH, has disbursed all profits as described above, and has agreed with Marlow, Blackwood, (Wayne) Walters, TGH, Sunflower Management, Sunflower RCM, and WWS to receive the benefit of TGH's fractional fee payments, to disburse the profits from those payments, to have the amounts of those payments (and profits therefrom) included as purported allowable costs to TGH, and to otherwise carry out to its benefit the operation described above, in knowing violation of the statutes and regulations also described above.

82. All such conduct by each such Defendant, and all transactions and related conduct described above concerning all fractional fee contracts and payments by TGH, caused the submission by TGH of false cost reports and false monetary claims to Medicare (with false "claims" including both the cost reports themselves and each monthly claim thereafter for per diem payments by Medicare for each Medicare eligible patient of TGH), in violation of the False Claims Act. 31 U.S.C. § 3729.

2d Am. Compl. [228] at 25-34, 47-49.

The foregoing reveals that in the Proposed First Amended Complaint [107-1], [107-2], Relators set out or attempted to set out allegations that Marlow, through his management company or companies, caused TGH to enter into management contracts and to include unallowed expenses in its cost reports. *See* Proposed 1st Am. Compl. [107-2] at 5-7, 13-15. This is the same essential theory Relators advance against Marlow in the Second Amended Complaint [228] as to TGH, even though a new contract with a new, but closely related, entity was added. *See* 2d Am. Compl. [228] at 25-34.

Beyond adding factual detail, the primary differences between the Proposed First Amended Complaint [107-1], [107-2] and the Second Amended Complaint [228] are that the latter: (1) implicates Blackwood and Wayne Walters as Marlow's accomplices; (2) drops its allegations of management contracts with companies other than Sunflower Management; and (3) includes allegations related to a revenue cycle management contract with Sunflower RCM. *Compare id.*, *with* Proposed 1st Am. Compl.[107-2] at 5-7, 13-15. However, the central theme or core theory of liability remains the same, that Marlow and others, through these various companies, caused TGH to enter into various management contracts and to submit "false cost reports and false monetary claims to Medicare." 2d Am. Compl. [228] at 25-34.

As such, the Court finds that the Second Amended Complaint [228] merely amplifies and corrects the claims that were set out, or attempted to be set out, in the Proposed First Amended Complaint [107-1], [107-2].  Fifth Circuit precedent

has held more than once that such amplifications permit relation back. *Newberry v. Cent. of Georgia Ry. Co.*, 276 F. 337, 339 (5th Cir. 1921) ("'If the amendment merely expanded or amplified what was alleged in support of the cause of action already asserted, it related back to the commencement of the action and was not affected by the intervening lapse of time."); *see also McClellon*, 66 F.3d at 102; *Conner*, 20 F.3d at 1386 ("Conversely, if a plaintiff seeks to correct a technical difficulty, state a new legal theory of relief, or amplify the facts alleged in the prior complaint, then relation back is allowed.").

For example, in *United States v. Johnson*, the Fifth Circuit allowed plaintiffs to relate back their negligence allegations against the United States arising out of seven specific plane crashes on their property, where the original complaint "contained no allegation of any specific crash or illegal low-level flight; and it contained no allegation of any negligence on the part of the United States in connection with any crash or crashes or any flight or flights." 228 F.2d 40, 41-42 (5th Cir. 1961); *see also Bennett*, 898 F.2d at 480 (citing *Johnson* in support of allowing relation back even where a plaintiff wholly changed their theory of liability). In *Gray v. Upchurch*, a case from this District, the Court permitted the relation back of RICO claims where the original complaint only contained common law fraud allegations. *See* No. 505-CV-210-KS-JMR, 2006 WL 3694604, at *2-4 (S.D. Miss. Dec. 13, 2006). The Court applied the relation back doctrine even though the amended complaint added additional facts because the claims arose from the same factual background. *Id.* at *4 (finding the amended complaint "further develop[ed]

the factual underpinnings of their fraud claims" and "more specifically explain[ed] how the fraud was allegedly perpetrated against the plaintiffs").

The facts in this case fall within the range of amplification allowed in the foregoing cases. Relators' Proposed First Amended Complaint [107-1], [107-2] set out, or attempted to set out, FCA allegations based on the same or related Medicare cost reports upon which the Second Amended Complaint [228] bases its allegations. *Compare* 2d Am. Compl. [228] at 25-34, *with* Proposed 1st Am. Compl. [107-2] at 5-7, 13-15. The fact that the Second Amended Complaint fleshed out or refined these allegations after discovery does not substantially change the factual underpinning of the FCA claims. Had Relators been able to file it, the claims in the Proposed First Amended Complaint [107-1], [107-2], while perhaps in need of refinement and clarity, were sufficient to place Marlow on notice that Relators were bringing claims against him related to management contracts at TGH and Medicare cost reports submitted by TGH. *See* Proposed 1st Am. Compl. [107-2] at 5-7, 13-15. Additionally, Relators did eventually make these claims; when Relators filed their First Amended Complaint [158], they brought substantively identical TGH allegations as outlined in the Proposed First Amended Complaint [107-1], [107-2]. *Compare* 1st Am. Compl. [158] at 35-38, 44-45, *with* Proposed 1st Am. Compl. [107-2] at 5-7, 13-15.

Defendant cites *United States v. Corporate Management, Incorporated* in support of his contention that the claims do not relate back. Reply [400] at 12-15. In *Corporate Management*, the Fifth Circuit analyzed the relation back doctrine set out in 31 U.S.C. § 3731, which allows the Government to relate back its own or

amended complaint to the relators' original complaint after intervening "'to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of [relators.]'" *Corp. Mgmt., Inc.*, 78 F.4th at 742-43 (emphasis omitted) (quoting 31 U.S.C. § 3731(c)). The Fifth Circuit analogized the statute to Federal Rule of Civil Procedure 15, and held that "relation back is generally improper when, though a new pleading shares some elements in common with the original pleading, it faults the defendant for conduct different than that alleged in the original complaint." *Id.*

The initial complaint in *Corporate Management* asserted that defendants "falsified their claims by engaging in a number of practices including fraudulent cost reporting, inflating supply costs, manipulating the swing bed status of the hospitals controlled by [the management company] . . . , and improperly waiving co-payments and deductibles[,]" whereas the latter complaint set out that defendants "abused the special Medicare rules for Critical Access Hospitals by improperly claiming expenses for the [defendant's] excessive and unwarranted compensation for work not performed and for [defendant's] personal luxury automobiles . . . ." *Corp. Mgmt., Inc.*, 78 F.4th at 743 (quotations omitted). The Fifth Circuit found that the different factual underpinnings of these claims were too dissimilar to allow relation back. *Id.*

That is not the case here. Unlike in *Corporate Management*, the core allegations that Marlow through various corporate entities caused TGH to submit false Medicare cost reports based on management contracts appears in Relators'

Proposed First Amended Complaint [107-1], [107-2], their First Amended
Complaint [158], and the Second Amended Complaint [228]. *Compare* 2d Am.
Compl. [228] at 25-34, *with* Proposed 1st Am. Compl. [107-2] at 5-7, 13-15, *and* 1st
Am. Compl. [158] at 35-38, 44-45. All these pleadings focus their allegations on
Marlow causing TGH to enter into management contracts and causing TGH to
improperly include their costs in its Medicare cost reports. *See* 2d Am. Compl. [228]
at 25-34; 1st Am. Compl. [158] at 35-38, 44-45; Proposed 1st Am. Compl. [107-2] at
5-7, 13-15.

In addition, even though the Sunflower Management contract mentioned in
the Proposed First Amended Complaint [107-1], [107-2], and First Amended
Complaint [158] is a separate contract, its similarity to the Sunflower RCM contract
in the Second Amended Complaint [228] in both creation and operation was such
that this was sufficient to plead that the transactions or occurrences were closely
related enough to allow relation back under Rule 15(c)(2). Marlow essentially relies
on *Corporate Management* to assert that two contracts cannot encompass the same
transaction or occurrence. Reply [400] at 12-15 (citing *Corp. Mgmt., Inc.*, 78 F.4th at
742 (discussing *Miller*, 608 F.3d at 882)). However, *Miller* is easily distinguishable
from this case; the two contracts here were entered into on the same day, and both
involved management work at TGH. 2d Am. Compl. [228] at 25-29. Additionally,
both contracts operated on the same fractional fee model upon which Relators
ground their FCA allegations. *Id.*

In *Miller*, the relevant contracts were entered into in different years, involved different bidders in an alleged bid-rigging process, and related to completely different projects. *See Miller*, 608 F.3d 871, 881 (D.C. Cir. 2010). *Miller* highlighted the important differences of each contract in reaching its conclusions. *See id.* ("In this case, all three contracts are similar only in that each was funded by the USAID and required work related to sewer systems in Egypt."). As such, *Miller*'s conclusion that "because each contract is unique and no two involved the same 'conduct, transaction[ ], or occurrence[ ]'" was specific to the facts of that case and is easily distinguishable from this case. *See id.* at 881-82 (alteration in original). Marlow only cites the foregoing excerpt from *Miller*, but a review of the entire sentence supports the court's holding in that case. *See id.* ("Allegations concerning Contract 20A do not fairly encompass Contracts 07 or 29 because each contract is unique and no two involved the same "conduct, transaction[ ], or occurrence[ ].") (alteration in original). It is clear that *Miller* was speaking specifically to those contracts, and not stating a general rule that different contracts can never involve the same "conduct, transaction, or occurrence." Fed. R. Civ. P. 15(c)(1)(B).

In sum, the Proposed First Amended Complaint [107-1], [107-2] and First Amended Complaint [158] would have allowed for relation back under Rule 15(c)(1)(B) but for the stay. As such, Relators' first Motion [107] for Leave filed on October 18, 2018, also tolled the six-year statute of limitations as to the TGH claims against Marlow, and Relators may bring claims against Marlow based on Medicare cost reports submitted by TGH after October 18, 2012. A partial summary judgment

dismissing Relators' TGH claims against Marlow based on Medicare cost reports submitted before October 18, 2012, is warranted.

### III.   CONCLUSION

To the extent the Court has not addressed any of the parties' remaining arguments,[6] it has considered them and determined that they would not alter the result. Defendant Billy Marlow's Motion [356] for Partial Summary Judgment should be granted in part and denied in part.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant Billy Nerren Marlow, Jr.'s Motion [356] for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, and all claims against Defendant Billy Nerren Malow, Jr. asserted by Relators based on Medicare cost reports for Tallahatchie General Hospital and North Sunflower Medical Center submitted for payment before October 28, 2012, are **DISMISSED WITH PREJUDICE** as time-barred.

**SO ORDERED AND ADJUDGED**, this the 21st day of December, 2023.

*s/Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

---

[6] Additionally, to the extent Marlow may argue that he did not have notice of this lawsuit until he was named as Defendant upon the filing of the First Amended Complaint [158] on July 2, 2021, the Court highlights that in an exhibit to Blackwood and Sunflower Holding's Motion [333] to Strike Robert F. Church's Expert Testimony, which Marlow has joined, *see* Joinder [351], Blackwood declares that TGH and Sunflower Holding ended its engagement with Robert F. Church when it discovered he was an expert witness in this case in the fall of 2018, Blackwood Decl. [333-3] at 2-3. Based on this assertion and Marlow's involvement with other current and former defendants, it strains credulity to believe Marlow had no notice of the ongoing litigation against TGH before or at the time of the filing of the 2018 Motion [107] for Leave, especially where Marlow was a "co-principal/owner" of Sunflower Holding at the time. Joinder [351] at 1.